United States District Court
For the District of Columbia

| | |
|---|---|
| Kyaw Zaw Nyunt,<br>    Plaintiff,<br><br>v.<br><br>Kenneth Y. Tomlinson,<br>Chairman,<br>Broadcasting Board of Governors,<br>    Defendant. | CA No. 06 – 1152 (JDB) |

**Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment**

**Introduction**

The Broadcasting Board of Governors ("BBG") is granted authority to "employ, without regard to civil service or classification laws, aliens within the United States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs when suitably qualified United States citizens are not available when job vacancies occur …." in 22 U.S.C. § 1474(1).

For many years the agency administered this provision as permitting employment of aliens only where no minimally qualified US citizens were available.

After an unsuccessful effort at for an amendment to the law in 1983, BBG revised its interpretation claiming that "[b]ased on Congressional Committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" See Attachments A and B to Affidavit of K. Nyunt, submitted herewith. In effect, the agency claimed authority to hire aliens unless the US citizen is equally or better qualified than the alien.

1

As set out in the discussion below, this construction eviscerates the preference for US citizen applicants mandated by section 1474 and is wholly at odds with the contemporaneously expressed intentions of Congress.

Plaintiff Nyunt has suffered directly from this policy. BBG selected an alien over him for a vacancy in which Plaintiff, a US citizen, submitted timely applications and was determined to be the best qualified of the US citizens competing for the position. Because Plaintiff was a "suitably qualified United States citizen" within the meaning of section 1474, properly construed, the selection of the alien must be declared unlawful.

**Facts**

Plaintiff worked as a GS 9 international radio broadcaster ("IRB") for Broadcasting Board Governors ("BBG") beginning in May 1998 and was later promoted to a GS 11. Prior to coming to BBG he had worked for the British Broadcasting Company as a broadcaster from 1968 to 1971. He also worked as Deputy Chief of Mission for Burma in the Rome Embassy for three years and, prior to that, as an officer for the Burmese Ministry of Foreign Affairs in Rangoon for more than twelve years. He holds a bachelor's degree in international relations and political science from the University of Rangoon and a diploma in computer management from London Technical College. He earned a master's degree from the Johns Hopkins University in international public policy in 1988. He has other technical and computer training as well. He was born and raised in Burma. He became a naturalized US citizen in 1998. In 2003 he was a GS - 11 international radio broadcaster at BBG. He was 58 years of age in early 2003. See Affidavit of K. Nyunt at 1, Attached.

Plaintiff filed timely applications for a GS- 12 international broadcaster position designated VA No. 03-29 in the Burmese service of BBG which was advertised in March, 2003. He was determined to be eligible for the position by BBG and his name was referred to the selecting official as eligible for selection on a certificate set aside for US citizen applicants in accordance with the practice of BBG. He was ranked the highest among the citizens referred on the certificate to the selecting official. See Affidavit of K. Nyunt at 2, Attached.

He was passed over for the position in favor of a non- citizen, Than Lwin Htun, a resident of Thailand at the time of his application for the position. Mr. Htun was under the age of 40 at the time of his selection. See Affidavit of N. K. Nyunt at 2, Attached.

The selection of Mr. Htun was rationalized by a memorandum of the selecting official asserting that Mr. Htun was more qualified for the position that the US citizen applicants, including Plaintiff. See Affidavit of K. Nyunt at 2, Attached.

In reliance upon its construction of 22 U.S.C. § 1474(1), BBG made the determination that Plaintiff and the other US citizen applicants were not "suitably qualified United States citizens" as to the position because Mr. Htun was deemed more qualified. See Affidavit of K. Nyunt at 2, Attached.

BBG has taken the official position that "[b]ased on Congressional Committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" See BBG Personnel Manual at Section 820 and Guidelines for Selection, Promotion, and Employment of Non-US Citizens in the Presence of Qualified U.S. Citizen Competitors, Attachments A and B to Affidavit of K. Nyunt. In effect, the agency claims authority to hire aliens unless the US citizen is deemed equally or better qualified than the alien

Mr. Htun entered on duty at BBG in February, 2004. In May 2005, Mr. Htun, still a non-citizen, was promoted to the GS 13 supervisory position of chief of the Burmese section, which is called a service chief, where his primary duties are making editorial policy for all Burmese language activities and hiring and managing the entire Burmese language staff. See Affidavit of K. Nyunt at 2, Attached.

**Legislative Setting**

The United States Information and Education Act of 1948, known as the Smith Mundt Act of 1948, Pub. L. 80 – 402, 62 Stat. 6 (January 27, 1948) ("Act"), grew out of a realization that the information dissemination and broadcasting activities of the Department of State undertaken during the war needed formalization and supervision.

Section 801(5) of the Act authorized the agency:

> to employ, without regard to the civil-service and classification laws, when such employment is provided for by the appropriation Act, (i) persons on a temporary basis, and (ii) aliens within the United States, but such employment of aliens shall be limited to translation or narration of colloquial speech in foreign languages when suitably qualified United States citizens are not available.

See 62 Stat. 12.

The restriction on employment of aliens was no accident. The intention of the bill was to formalize the information dissemination activities of the United States to tell its story to the world, particularly to the areas of the world where objective information was a scarce commodity. The crafters of the legislation were so concerned that the information reflect genuine American values that the law required in section 1001 *pre-employment loyalty checks* by the Federal Bureau of Investigation *for US citizens*. See 62 Stat. 13.

In a colloquy during a House Foreign Affairs Committee hearing on the House bill that became the Act, HR 3342, the restrictions on the employment of non-citizens were discussed by Rep. Mundt, the prime House sponsor of the bill, who declared:

> May I call your attention on page 13 that we have inserted an additional safeguard which was not in the legislation originally discussed by the committee. I provide under subsection (7) that this agency, the Department, is empowered to employ --
>
>> aliens within the United States, but such employment shall be limited to services related to the translation or narration of colloquial speech in foreign languages when suitably qualified United States citizens are not available.
>
> There has been some criticism that a large number of aliens have been indiscriminately employed in this service, and I surely agree that *this is the last place in the world that aliens should be indiscriminately employed. If we are going to interpret America abroad, it should be done by Americans.*

Hearings before House Committee on Foreign Relations on HR 3342, 80th Cong., 1st Session, May 13, 14, 16, 17 and 20, 1947 at page 188 (emphasis added).

Section 1474 was amended by Pub. L. 96-60, 93 Stat. 398, 400 (August 15, 1979). The amendment deleted the requirement of an appropriation act provision and expanded the duties that aliens could discharge.[1] The amendment retained the original restriction that the authority to employ aliens was limited to "when suitably qualified United States citizens are not available."

The legislative history of the 1979 amendment reinforced the declared intention that qualified US citizens had an absolute priority over aliens in employment.[2] The report

---

[1] The provision as amended authorized the agency to "employ, without regard to civil service or classification laws, aliens within the United States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs when suitably qualified United States citizens are not available."

[2] The Senate Report on the 1979 amendment stated:

> Subsection 205(b) (1) and (2) amend the Smith – Mundt Act of 1948 by extending the ICA's present authority to permit the employment

5

declared that "the purpose of these subsections is to obtain permission for aliens to do this work *when Americans are not available.*" (emphasis added).

Section 1474 was amended again in 1990 by Pub. L. 101- 246, 104 Stat. 53, by the addition of the words "when job vacancies occur." The intention of the amendment was set out in the Joint Explanatory Statement of the Conference Committee as follows:

> The House bill (sec. 212) amends *existing law which requires that USIA give preference for hiring U.S. citizens for VOA language services whenever a position exists.* Existing law provides preference for the employment of *qualified Americans* even if application of the preference would require the firing of alien employees who were hired at a time, and often at great expense, when *no qualified U.S. citizens were available.* The House provision would revise the existing preference for hiring U.S. citizens to apply it only at times when such positions are open, rather than whenever such positions exist.
> The Senate amendment (sec. 211) contains a nearly identical provision.
> The conference substitute (sec. 207) is the same as the House provision.

House Conference Rept. No. 101-343, 101st Cong. 2nd Session at 108, reprinted at 1990 *US Code Congressional and Administrative News* at 43, 66 (emphasis added).

---

of aliens not only for narration and translation, as is now authorized, but also for the preparation and production of foreign language programs, by deleting the need for repetitious language in the Agency's annual appropriations act for authority to hire aliens within the United States ….

At present, aliens are restricted to doing narration and translation work. It is frequently impossible to find American citizens to do the supervisory-level work of preparation or production of programs in several foreign languages, and the purpose of these subsections is to obtain permission for aliens to do this work *when Americans are not available.* There is a maximum of 40 such personnel slots which should be filled by aliens, most of which are at Voice of America ("VOA"), and most of which will at any time be filled by U.S. citizens. *By law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position.*

These subsections will also insert in permanent legislation the authority of ICA to hire aliens within the U.S. The Agency now has the power to hire aliens abroad and then to bring them to the U.S. Authority for domestic hiring of aliens has been repealed for many years in appropriation acts.

Senate Rept. No. 96-116, 96th Cong., 1st Sess. at 20, reprinted at *1979 US Code Congressional and Administrative News* 982, 1001 (July 31, 1979) (emphasis added).

Thus, the 1990 amendment explicitly reaffirmed the existing preference for *qualified US citizens in filling vacancies*. The effect of this amendment was to spare the agency the need to terminate an alien already working in the United States when a qualified US citizen became available by limiting the US citizen preference to "when job vacancies occur."

**Administrative Interpretation**

Importantly, there is no dispute that BBG's predecessor agencies interpreted the term "suitably qualified" within the meaning of Section 1474 to mean "minimally qualified" from 1948 at least through some time in 1983. Thus, *even after the 1979 amendment, the section 1474 was administered by the agency so as to prohibit hiring of aliens when minimally qualified US citizens were available for a vacancy.*

**The BBG Rationalization**

BBG has taken the position in its official personnel guidance that "[b]ased on Congressional Committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" See BBG Manual of Operations at Section 820 and Guidelines for Selection, Promotion and Employment of Non – U.S. Citizens in the Presence of Qualified U.S. Citizen Competitors. Affidavit of K. Nyunt, Attachments A and B. The reports upon which BBG relies are actually denominated "Committee Comments" from certain appropriations bills in 1982. See H. Rept. 97-480, 97th Cong., 2d Sess. (1982), the House Foreign Relations Committee report accompanying H.R. 5998 during the 1982 authorization act process, and S. Rept. 97-429, 97th Cong., 2d Sess. (1982), the Senate Foreign Relations Committee report accompanying S. 2581. Copies of the relevant excerpts, supplied by Defendant in discovery, are attachments C and D to the Affidavit of

7

K. Nyunt. The Committee Comments did not appear in the report accompanying the appropriation act that was adopted for the agency in the 97th Congress, Pub. L. 97-241. See S. Rept. 97-71, 97th Cong., 2d Sess. (1982) and H. Conf. Rept. 97-693, 97th Cong., 2d Sess. (1982), reprinted at *1982 U.S. Code Congressional and Administrative News* at 651 and 691.

The Committee Comments upon which BBG relies noted that the administration had requested an amendment the law to authorize employment of aliens when "equally or better" qualified U.S. citizens were not available but that no amendment was adopted. The Comments assert that "because of the lack of legislative history of the issue," the words "suitably qualified" had been interpreted by the agency as "minimally qualified." Finally, the Comments conclude that a more "sensible" interpretation might be permissible to address the staffing needs of the agency. S. Rept. 97-71, 97th Cong., 2d Sess. (1982), Affidavit of K. Nyunt, Attachment C.

The House Committee Comments add that the Senate Foreign Relations Authorization Act for fiscal years 1980 and 1981 had stated that "[b]y law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position." The House Comments note that the House reports for those years offer a more flexible description citing the recruitment problems of the agency and the possible utility of aliens with proper security clearances. The Comments continued that "[t]he more specific dictates of the Senate report appear to require VOA to terminate the employment of a qualified alien (or to move that person laterally to a potentially less important job within the Agency) in order that a lesser or 'minimally' qualified U.S. citizen be employed or promoted." See H. Rept. 97-480, 97th Cong., 2d Sess. (1982) at 2- 3, Affidavit of K. Nyunt, Attachment D. After noting the competing demands on the agency, the House

Committee Comments conclude that "[i]n fact, 'suitable' in itself means 'qualified' and should be applied to those who are able to present a quality product." *Id.*

Some time thereafter the agency changed its policy so as to define "suitably qualified" US citizen as "equally or better qualified."

**Discussion**

For the reasons set out below, the BBG construction of "suitably qualified" US citizen and, in particular, its reliance on appropriations Committee Comments from 1983 cannot withstand analysis.

To begin with, the best guide to the meaning of statutes must be found in the words themselves, of course. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994). Unless otherwise defined, statutory terms are construed in accordance with their ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979).

Here, a United States citizen candidate that meets the minimum qualifications is "suitably qualified" for the position in ordinary terms. The term "suitably qualified United States citizen" is not a relative description; that is, the words make no reference to the relative qualifications of alien applicants. Thus, a highly qualified US citizen applicant should be "suitably qualified" within the meaning of this section. If a highly qualified applicant were to be matched against a superbly qualified alien for a vacancy, the highly qualified applicant would still be "suitably qualified" within the meaning of section 1474 even if the alien were deemed to have superior qualifications. The agency construction of the language that way before and immediately after the 1979 amendments is, of course, very telling.

9

The agency construction that "suitably qualified" may be read to mean "equally or better qualified" reduces the preference intended for US citizens to the abstract case where the qualifications are deemed equal.

Moreover, the suggestion in the Committee Comments of a lack of legislative history is accompanied by no discussion at all. Rep. Mundt's declaration that *"[i]f we are going to interpret America abroad, it should be done by Americans,"* Hearings before House Committee on Foreign Relations on HR 3342, 80th Cong. 1st Session, May 13, 14, 16, 17 and 20, 1947 at page 12 (emphasis added), seems not to have been accorded any consideration at all. This declaration was uttered in the specific context of the restriction on the employment of aliens to cases where "suitably qualified" US citizens were unavailable.

The legislative history accompanying 1979 amendments to Section 1474 reinforce principle that the authority to employ aliens was limited to cases where no qualified US citizens were available. See Senate Rept. No. 96-116, 96th Cong., 1st Sess. at 20, reprinted at *1979 US Code Congressional and Administrative News* 982, 1001, July 31, 1979 ("…. the purpose of these subsections is to obtain permission for aliens to do this work *when Americans are not available.* There is a maximum of 40 such personnel slots which should be filled by aliens, most of which are at Voice of America ("VOA"), and most of which will at any time be filled by U.S. citizens. *By law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position.*") (emphasis added). In fact, the "more specific dictates" of the Senate appropriations reports from 1980 and 1981, sought to be distinguished in the House Committee Comments, do nothing more than reiterate the settled proposition that the agency was required to grant a preference for qualified citizens. In other words, the House Committee Comments are nothing more that a

10

direct repudiation of the often repeated contemporaneous legislative explanations of the meaning of the term "suitably qualified" as "minimally qualified."

The 1990 amendment, limiting the US citizen preference to "when vacancies occur," reaffirmed the firm preference for US citizens in filling vacancies. See House Conference Rept. No. 101-343, 101st Cong. 2$^{d}$ Session at 108, reprinted at 1990 *US Code Congressional and Administrative News* at 43, 66 ("The House bill (sec. 212) amends *existing law which requires that USIA give preference for hiring U.S. citizens for VOA language services whenever a position exists.* Existing law provides preference for the employment of *qualified Americans* even if application of the preference would require the firing of alien employees who were hired at a time, and often at great expense, when *no qualified U.S. citizens were available.*") (emphasis added).

The Committee Comments relied upon by BBG do not constitute Committee Reports, as BBG wants to suggest, or legislative history in any sense at all. After all, the text is denominated "Committee Comments," which is fundamentally different from an amendment or a declaration of contemporaneous intention. The comments relate to no relevant legislative action. No amendments to section 1474 were made at that time and, in fact, the Congress expressly turned down the Administration request for an amendment. The appropriations bills for the 1983 fiscal year do not contain the Committee Comments upon which BBG relied.

Given that "there is 'a very strong presumption' that appropriations acts do not substantively change existing law," *Whatley v. District of Columbia*, 447 F.3d 814, 816 (D.C. Cir. 2006), then surely language denominated "Committee Comments" in reports on

11

appropriations bills that never passed have all the weight of a whizzing quark. [3]

The Committee Comments unrelated to any relevant legislation are mere "legislative dicta" with no status in the evaluation of legislative intent. See *Dunn v. Commodity Futures Trading Commission*, 519 U.S. 465, 478 (1997). Such dicta cannot trump the language of the Act and legislative history contemporaneous with enactment. The long course of administrative interpretation together with explicit denial of the amendment requested by the agency creates an adverse inference against the interpretation adopted by the agency.

Section 1474 intended to establish a firm preference for US citizen applicants over aliens in filling vacancies. The current BBG construction of the provision to limit the preference for US citizens to cases where the US citizen must be "equally or better qualified" than an alien eviscerates the language and intent of section 1474. "Suitably qualified United States citizen" under section 1474 must be read to mean a "minimally qualified United States citizen."

There is no dispute that Plaintiff Nyunt was well qualified and, indeed, the highest ranked of the three qualified US citizens referred to the selecting official, for the position in VA No. 03-29 in the Burmese service of BBG advertised in March, 2003. The agency actions employing an alien over Plaintiff Nyunt in reliance on this challenged interpretation must therefore be found unlawful.

---

[3] The Committee Comments do not constitute legislative history in any sense. Even if they were so construed, legislative history that post-dates passage of the relevant language is rarely used as a reliable guide to legislative intent. *Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 118 n.13 (1980)* ("Even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment."). Reliance on subsequent legislative history is notoriously suspect and "'form[s] a hazardous basis for inferring the intent of an earlier [Congress].'" *Jefferson County Pharmaceutical Ass'n v. Abbott Laboratories*, 460 U.S. 165 n.27 (1983).

**Conclusion**

In sum, Plaintiff Nyunt was a "suitably qualified United States citizen" applicant within the meaning of 22 U.S.C. § 1474(1) available for selection in filling VA no. 03-29 in the Burmese service of BBG in March 2003. Selection of a non-citizen for the vacancy must be declared as unauthorized by section 1474(1).

A proposed order, affidavit of Plaintiff K. Nyunt and statement of material facts are submitted herewith.

Respectfully submitted,

Timothy B. Shea
DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW  Suite 500
Washington, DC  20006
Tel. 202 835 0300
Fax 202 835 0306

Attorney for Plaintiff Kyaw Zaw Nyunt