United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Kyaw Zaw Nyunt,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | CA No. 06 – 1152 (JDB) |
| Kenneth Y. Tomlinson,<br>Chairman,<br>Broadcasting Board of Governors,<br>    Defendant. | )<br>)<br>)<br>) | |

**Affidavit of Kyaw Zaw Nyunt**

I, Kyaw Zaw Nyunt, hereby declare based on my personal knowledge:

**Introduction.** I began work as a GS 9 international radio broadcaster ("IRB") for Broadcasting Board Governors ("BBG") beginning in May 1998. I was later promoted to a GS 11 IRB at BBG. Prior to coming to BBG I had worked for the British Broadcasting Company as a broadcaster from 1968 to 1971. I also worked as Deputy Chief of Mission for Burma in the Rome Embassy for three years and, prior to that, as an officer for the Burmese Ministry of Foreign Affairs in Rangoon for more than twelve years. I hold a bachelor's degree in international relations and political science from the University of Rangoon and a diploma in computer management from London Technical College. I earned a master's degree from the Johns Hopkins University in international public policy in 1988. I have other technical and computer training as well. I was born and

raised in Burma. I became a naturalized US citizen in 1988. In 2003 I was a GS 11

international radio broadcaster at BBG. I was 58 years of age in early 2003.

1. I filed timely applications for a GS- 12 international broadcaster position
   designated VA No. 03-29 in the Burmese service of BBG which was advertised in
   March, 2003.

2. I was determined to be eligible for the position by BBG.

3. My name was referred to the selecting official as eligible for selection on a
   certificate set aside for US citizen applicants in accordance with the practice of
   BBG. My rating was the highest among the three qualified United States citizens
   on the certificate.

4. I was not selected for the position.

5. BBG selected a non- citizen, Than Lwin Htun, a resident of Thailand at the time
   of his application for the position. Mr. Htun was under the age of 40 at the time of
   his selection.

6. The selection of Mr. Htun was rationalized by a memorandum of the selecting
   official asserting that Mr. Htun was more qualified for the position that the US
   citizen applicants, including myself.

7. In reliance of its construction of 22 U.S.C. § 1474(1), BBG made the
   determination that I, along with the other US citizen applicants, was not "suitably
   qualified" for the position because Mr. Htun was deemed more qualified.

8. BBG has taken the position in official advice to its officers that "[b]ased on
   Congressional Committee reports, the Agency has interpreted the term 'suitably
   qualified' to mean 'equally or better qualified.'" See BBG Personnel Manual at

Section 820 and Guidelines for Selection, Promotion, and Employment of Non-US Citizens in the Presence of Qualified U.S. Citizen Competitors, Attachments A and B hereto. In effect, the agency claims authority to hire aliens unless the US citizen is equally or better qualified than the alien.

9. Mr. Htun entered on duty at BBG in February, 2004. In May 2005, Mr. Htun, still a non-citizen, was promoted to the GS 13 supervisory position of chief of the Burmese section, which is called a service chief, where his primary duties are making editorial policy for all Burmese language activities and hiring and managing the entire Burmese language staff. In that capacity, Mr. Htun is now my supervisor.

10. Attachments C and D hereto are copies of the documents BBG describes as the Congressional Committee Reports upon which it relied in its construction of 22 U.S.C. section 1474.

Sworn and subscribed to under the penalty of perjury this 3rd day of April 2007,

Kyaw Zaw Nyunt

United States District Court
For the District of Columbia

Kyaw Zaw Nyunt,                                    )
     Plaintiff,                                 )
                                                )
     v.                                         )
                                                )        CA No. 06 – 1152 (JDB)
Kenneth Y. Tomlinson,                              )
Chairman,                                          )
Broadcasting Board of Governors,                   )
     Defendant.                                 )


**Attachments to Affidavit of Kyaw Zaw Nyunt**


A.     BBG Personnel Manual at Section 820

B.     BBG Guidelines for Selection, Promotion, and Employment of Non-US Citizens in the Presence of Qualified U.S. Citizen Competitors

C.     S. Rept. No. 97 – 429, 97th Cong., 2d Sess. (May 26, 1982) (excerpts)

D.     H. Rept. 97 – 180, 97th Cong., 2d Sess. (April 2, 1982) (excerpts)

**PART V-A PERSONNEL (DOMESTIC)**
**800 SPECIAL CATEGORIES OF PERSONNEL**
Last Updated: 03/01/99

Section 820
EMPLOYING NON-U.S. CITIZENS FOR DUTY IN THE UNITED STATES

821    Introduction
821.1 Purpose
821.2 Related Information
821.3 Authority

*ATTACHMENT A*

822 Policy
822.1 Employment and Promotion - Limitations
822.2 Termination
822.3 Security

823 Responsibilities
823.1 Office of Personnel
823.2 Non-U. S. Citizen Employees

824 Conditions of Employment
824.1 Conditions Applicable to all Non-U. S. Citizen Employees
824.2 Conditions Applicable to Excepted Appointments (GG)

825 Exchange Visitor Program G-1-120 (J-1 Visa)
825.1 Authority and Reference
825.2 Request for Waiver of the Two-Year Home-Country Physical Presence
Requirement
825.3 Review Board Criteria for Requests for Waiver
825.4 Offer of long-term employment
825.5 Change in Visa Status

826 Rotational Assignment (Voice of America)
826.1 Purpose
826.2 Designation of Rotational Positions
826.3 Rotational Assignment - Recruitment
826.4 Rotational Assignment - Expiration of Appointment

Section 820
EMPLOYING NON-U.S. CITIZENS FOR DUTY IN THE UNITED STATES

**821 INTRODUCTION**

821.1 Purpose - The following material prescribes Broadcasting's policies, responsibilities, and procedures governing the employment in the United States of non-U.S. citizens in positions which require (1) services related to the translation or narration of colloquial speech in foreign languages; (2) the preparation and production of foreign language programs; or (3) the selection, evaluation, editing, writing and adaptation of source material for use in foreign language programming.

NYUNT - EEOC No. 100-2004-0921X
Interr. #9 Doc. Req #3

9/22/00 12:59 PM

821.2 Related Information - MOA V-B 870 prescribes procedures to be followed in overseas recruitment and hiring of non-U.S. citizens for duty in the United States.

821.3 Authority - The United States Information and Educational Exchange Act, P.L. 80-402, as amended, authorizes employment of non-U.S. citizens in the United States for the services described in 821.1 above when equally or better qualified U.S. citizens are not available.

## 822 POLICY

### 822.1 Employment and Promotion - Limitations

a. A non-U.S. citizen may be appointed only after reasonable efforts to recruit equally or better qualified U.S. citizens have been made and have been unsuccessful. A non-U.S. citizen may be employed or promoted only if no equally or better qualified U.S. citizen is available to perform the duties of the position. The determination as to whether a non-U.S. citizen is better qualified than a U.S. citizen will be based upon criteria established by Personnel to evaluate the qualifications of both citizens and non-citizens.

b. A non-U.S. citizen applicant will be required to qualify in the appropriate examination(s) and meet all other employment standards that apply to employment of U.S. citizens in such positions.

c. As a matter of Broadcasting policy, non-U.S. citizens will not be employed in or promoted to supervisory positions or positions which involve policy or program decision-making.

(1) Exceptions will be allowed only on an individual basis when the appropriate Office, or Service Head determines, with the concurrence of the Director of Personnel that the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but also is having an adverse impact on Broadcasting's mission.

(2) It is anticipated that positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-13 grade level.

d. It is the policy of Broadcasting to have the terms of excepted (GG) appointments parallel the conditions of GS employment to the extent possible and practicable.

e. Under no circumstances will non-U.S. citizens be employed in circumvention of Immigration and Naturalization Service (INS), Department of Labor, or Department of State regulations.

f. When a non-U.S. citizen employed by Broadcasting becomes a U.S. citizen, the current excepted appointment will be terminated as soon as practicable and the employee may be offered a competitive service appointment if his/her performance and conduct are satisfactory, if he/she is within reach on the appropriate Office of Personnel Management (OPM) register or another legal basis for competitive appointment exists, and if he/she obtains the appropriate clearance of the Office of Security. If the individual is not selected for a competitive service appointment or other appointment under an authority for hiring

U.S. citizens, he or she will be separated from Broadcasting.

g. When an equally or better qualified U.S. citizen becomes available to fill a position occupied by a non-U.S. citizen, such U.S. citizen shall be employed as soon as practicable. (See 822.1a)

h. If a non-U.S. citizen is subject to displacement because an equally or better qualified U.S. citizen is available, his/her appointment will be terminated. The displaced non-U.S. citizen may be offered a new appointment to another position for which he/she is qualified if another position is available at the same or a lower grade level. If the position is at a lower grade level, and the higher-level position was held for a minimum of 90-days, the non-U.S. citizen will be placed at the salary level equivalent to his/her current salary, not to exceed the maximum range of the grade (i.e., step 10). If the displaced employee did not occupy the higher-level position for 90 days, salary will be set at step 1 of the grade or, if promoted from that grade, the step held immediately prior to the promotion to the higher-level position. The time spent at the higher level will be creditable for determination of WGI due date.

822.2 Termination - Non U.S.-citizen staff employees serve at the discretion of Broadcasting under the authority of P.L. 80-402, as amended. Accordingly, should such an employee's performance or conduct fall below an acceptable level, or if a need no longer exists for the employee's services, the employee's limited excepted appointment may be terminated at any time by the Director of Personnel . The employee will normally be given at least 30 days' advance notice prior to the effective date of termination.

822.3 Security

a. Official employee identification cards for limited access personnel will be issued by the Office of Security to non-U.S. citizen employees.

b. Non-U.S. citizen employees may not have access to classified material. Oral briefing is permitted on Secret, Confidential, and administratively controlled material, but not on material classified Top Secret.

c. Non-U.S. citizen employees may not be given responsibility for the opening or closing of bar-lock cabinets or safes containing classified or administratively controlled materials.

d. Safe combinations may not be made known to non-U.S. citizen employees.

823 RESPONSIBILITIES

823.1 Office of Personnel - is responsible for:

a. Assuring that a non-U.S. citizen is employed in a position covered by 821.1 of this section and only in the absence of available U.S. citizen candidates who are equally or better qualified than the non-citizen to perform the duties of the position.

b. Assuring that pre-employment processing, including approval of the Office of Security, of a non-U.S. citizen candidate is initiated only if the candidate's employment would be in accordance with the applicable regulations of the Departments of State and Labor and the Immigration and Naturalization Service.

9/22/00 12:59 PM

c. Taking appropriate action when notified of change in visa or citizenship status of non-U.S. citizen employees.

d. Offering and determining the duration of appointments.

e. Notifying employees of renewal or non-renewal of appointments.

f. Initiating disciplinary action, as necessary.

g. Terminating appointments.

823.2 Non-U.S. Citizen Employees

a. Each non-U.S. citizen employee is responsible for immediately informing the Office of Personnel, of any change in visa or citizenship status.

b. Each non-U.S. citizen employee must consult with Personnel before undertaking any employment outside Broadcasting.

824 CONDITIONS OF EMPLOYMENT

824.1. Conditions applicable to all Non-U.S. Citizen Employees GG)

a. Annual and sick leave, holiday benefits, and premium pay will be accorded to non-U.S. citizen employees (GG appointees) in the same manner as GS employees.

b. Non-U.S. citizen employees are responsible for paying Federal and local taxes as required by law, including Federal, State, District of Columbia or local municipal taxes. Deductions are made from salaries when required by law or executive directive. All non-U.S. citizens on visas other than "J" and "F" will be subject to payroll deductions for Medicare coverage and Social Security taxes when applicable.

824.2 Conditions Applicable to Excepted Appointments (GG)

a. Basic Compensation - The basic compensation of an excepted employee serving in a GG position is the pay rate of the corresponding GS grade and step. Excepted employees serving in GG positions are eligible for within-grade step increases, including Quality Increases.

b. Health Benefits and Life Insurance - A non-citizen employee serving in an excepted (GG) position on an appointment not limited to one year or less, or on an extension of such an appointment, is eligible for coverage under the Federal Employees Health Benefits Program and the Federal Employees Group Life Insurance Program unless the employee is serving on a non-full-time appointment with no pre-arranged work schedule.

c. Retirement Coverage:

(1) A non-citizen employee, who, before January 1, 1984, served on an excepted (GG) appointment not limited to one year or less, or on an extension of such an appointment, is

covered by the Civil Service Retirement System (CSRS), and a seven percent contribution to the CSRS is withheld from the employee's basic pay. All but "J-1" and "F-1" visa holders also will be covered by Part A Medicare.

(2) A non-citizen employee holding a "J-1" or "F-1" visa who, at any time, served on an excepted (GG) appointment not limited to one year or less, or an extension of such an appointment, is covered by the CSRS and will pay seven percent of basic salary to the CSRS. Such employees are excluded from Medicare coverage. If such an employee initially was covered by CSRS on or after January 1, 1984, and later attains a change in visa status to other than "J-1" or "F-1", his or her coverage under CSRS will cease and will be converted to full Social Security and will contribute 1.3% of basic salary to the Federal Employees Retirement System (FERS).

(3) A non-citizen employee holding a visa other than "J-1" or "F-1", hired on or after January 1, 1984, and serving on an excepted (GG) appointment not limited to one year or less, or an extension of such an appointment, is covered by full Social Security and will also contribute 1.3% of basic salary to the Federal Employees Retirement System.

825 EXCHANGE VISITOR PROGRAM G-1-120 (J-1 visa)

825.1 Authority and Reference - Under the authority of the U.S. Information and Educational Exchange Act of 1984, P.L. 80-402, as amended; the Mutual Educational and Cultural Exchange Act of 1961, P.L. 87-256, as amended; and the Immigration and Naturalization Act (66 State. 163), P.L. 414, as amended, the Exchange-Visitor Program G-1-120 (J-1 visa) has been designated by Broadcasting to bring to the United States foreign nationals (and their spouses and dependent children) who are especially qualified to perform as foreign language broadcasters, translators, producers, writers, editors, and for training of foreign broadcasters. Barring special circumstances, such as previous history of Broadcasting employing a non-citizen in a temporary worker's or other non-immigrant visa category, all non-immigrant foreign national employees will be brought to the United States as alien employees of Broadcasting. (8 CFR 214.2 (j); 22 CFR 514.2 and 514.23.)

825.2 Request for Waiver of the Two-Year Home-Country Physical Presence Requirement - A request for a waiver of the two-year home-country physical presence requirement pursuant to Broadcasting's authority as an "interested United States Government Agency" may be submitted to Consular Affairs at the Department of State by the Office of Personnel.

825.3 Criteria for Requests for Waiver

a. After receipt of a request for a waiver of the two-year home-country physical presence requirement, (as described above), GC shall consider the request, along with any other relevant information, and determine the following:

(1) whether the granting of a waiver would be in the public interest; and

(2) whether the exchange visitor's compliance with the two-year home-country physical presence requirement would be clearly detrimental to a program or activity of official interest to Broadcasting.

9/22/00 12:59 PM

b. When a decision is made in favor of a request for a waiver of the two-year home-country physical presence requirement, GC will make a recommendation to the Waiver Review Office, Department of State, which will send its recommendation to the Immigration and Naturalization Service (INS). The INS has the final authority to issue a waiver.

## OFFER OF LONG TERM EMPLOYMENT

825.4 Within the first two years of employment a determination will be made on whether to offer an employee long-term employment. The Office of Personnel will contact the Service Chief six months prior to the end of the first two years of an individual's employment to initiate the review and decision-making process.

In extraordinary cases, Division Chiefs may elect to initiate the review after one year. In the very rare and exceptional case in which a decision on long-term employment cannot be made within the first two years of employment (e.g., employee absent for a prolonged period of time), an employee may be given a new temporary appointment of up to one additional year during which the decision must be made. Such an appointment must be justified by the Division Chief in writing and must have the approval of the Program Director and the concurrence of the Director of Personnel.

The criteria upon which management will base the determination on whether to offer an employee long-term employment are:

Performance by the employee which demonstrates fully his or her fitness and qualifications for continued employment.
Normally, such performance is characterized as excellent or as having the potential to perform in an excellent manner;

Conduct by the employee which is fully professional;

Personal and/or character traits (e.g., willingness to accept supervision and cooperate with others and attitude towards work), which warrant continued employment;

Suitability and security standards are fully met by the employee;

Needs of the service, which includes consideration of such factors as:

Availability of other candidates and their relative skill levels;

The benefits of hiring new employees who could be expected to enhance the currency of the language usage, provide fresh understanding of the cultural and political environment of the target area, and/or provide fresh programming ideas.

Programming and staffing needs and anticipated future changes (e.g., increase or decrease in staff levels; changes in types of skills needed) the ability of the employee to meet these needs.

Based on these criteria, the Service Chief will make a recommendation as to whether the employee should or should not be offered long-term employment (and therefore,

sponsorship), and forward this recommendation to the Division Chief. The Division Chief will review the recommendation and forward it with his or her own written recommendation and cover sheet to the Visa Coordinator, Office of Personnel, who will forward it to the Director of the Voice of America.

The VOA Director shall determine, with the concurrence of the Director of Personnel, whether to offer an appointment without time limitation and sponsorship. Once a final determination is reached, the employee is notified in writing of the decision. If he/she is not offered an appointment without time limitation, the employee must be advised of his/her opportunity to have the decision reconsidered by the Director of VOA.

## 825.5 Change in Visa Status

a. After (1) Broadcasting has determined that it is necessary and proper to retain the exchange visitor in its employ for an indeterminate period, a Labor Certification is requested and (2) a favorable recommendation for a waiver has been submitted to the INS, Broadcasting will then petition on behalf of the exchange visitor for the appropriate preference immigrant status. The Office of Personnel is designated to execute such petitions on behalf of Broadcasting.

b. Non-U.S. citizens, regardless of their visa status, are employed under a limited excepted (GG) appointment. Broadcasting's intervention to obtain a change in visa status in no way obligates Broadcasting to employ permanently any non-U.S. citizen.

## 826 ROTATIONAL ASSIGNMENT (VOICE OF AMERICA ONLY)

## 826.1 Purpose

a. In order to attract and maintain the optimum overseas audience, VOA must maintain current idiomatic language capability and understanding of the cultural environment of the target areas.

b. In support of the above, broadcasters for selected language services will be assigned to rotational positions within VOA for pre-determined periods in order to:

(1) enhance the currency of the language service;

(2) provide the service with fresh understanding of the cultural, social, and political environment of the target area, and

(3) establish and maintain friendly, mutually beneficial relations with foreign countries and/or radio networks.

## 826.2 Designation of Rotational Positions

a. VOA Division Chiefs, as appropriate, may recommend to the VOA Program Director, a number of their International Radio Broadcasting (IRB) positions as "rotational," within the existing allotment.

(1) Division Chiefs will recommend designating individual positions as "rotational" as they are vacated.

(2) Positions designated as "rotational" will not be filled by individuals other than on time limited <u>non-renewable</u> appointments.

b. Because of situations which may handicap recruitment in certain overseas areas, rotational assignments will not be appropriate in all VOA language services.

c. "Rotational" positions will be reserved for individuals whose appointments to VOA as IRB's are time limited, with the mutual understanding that at the end of a pre-determined period (of between 13-36 months) their appointment <u>will terminate without renewal</u>.

d. The Office of Personnel will control positions identified by language services as "rotational."

e. In unusual cases, such as where recruitment sources are cut off, the interests of VOA may warrant re-designation of "rotational" positions. In such instances, the Division Chief will submit in writing justification for recommending removal of the "rotational" identifier from the position to the Director of Personnel or designee. Personnel will make a recommendation to the VOA Program Director, whose decision will be final.

826.3 <u>Rotational Assignment - Recruitment</u>

a. Rotational assignments to language service positions will be coordinated through overseas posts as part of agreements with:

(1) foreign governments

(2) foreign commercial networks

(3) individuals

b. The Office of Personnel will work with the VOA Program area divisions in identifying adequate lead time to ensure a "pipeline" recruitment process which supplies a continual flow of candidates for "rotational" positions. Contracts signed in advance will be subject to the successful completion of the required security and medical clearances.

c. Personnel will coordinate all pre-appointment communication with candidates for "rotational" positions regarding conditions of their appointments at VOA. Personnel will secure written acceptance and understanding of the limited nature of the appointment from each candidate before the appointment is effected.

d. Candidates for "rotational" positions must pass the appropriate examinations for civil service employment administered under the auspices of Personnel by examiners and at test sites authorized by Personnel. The exams will be evaluated at VOA before an offer of employment may be made.

e. The Office of Personnel will coordinate with the language services appropriate orientation for individuals at VOA on rotation at least 30 days before their arrival.

826.4 <u>Rotational Assignment - Expiration of Appointment</u>

a. The appointment of a broadcaster in a rotational position may be terminated based on performance, conduct, or needs of the service at any time during the appointment.

b. Approximately 90 days before expiration of a "rotational" appointment, Personnel will remind the incumbent in writing of the impending expiration of the appointment so that he/she may begin preparation for departure.

c. The appointments of employees in the "rotational" program will not be extended. Only in rare circumstances, when the Division Chief has certified in writing that the language service will be seriously impaired by the loss of the employee, will Personnel make a review of the case, and it may recommend to the Program Director that the employee be appointed to a vacant non-rotational position.



## GUIDELINES FOR SELECTION, PROMOTION, AND EMPLOYMENT OF NON-U.S. CITIZENS IN THE PRESENCE OF QUALIFIED U.S. CITIZEN COMPETITORS

The Unites States Information and Educational Exchange Act, PL 80-402, as amended, authorizes VOA to employ, without regard to the civil service and classification laws, non-U.S. Citizens in a variety of functions related to non-English language programming. The law provides that such non-U.S. citizens may be employed only when there are no suitability qualified U.S. Citizens available for the position. Based on Congressional Committee reports, the Agency has interpreted the term "suitability qualified" to mean "equally or better qualified."

MOA V-A, Section 820 provides in subsection 822.1 that for positions in VOA these relative qualifications determinations will be based on evaluation criteria established by VOA/P. Evaluations of U.S. citizens and non-U.S. citizens under subsection 822.1 are to determine if, in the presence of a qualified U.S. citizen competitor, (1) a non-U.S. citizen candidate can be appointed, (2) a non-U.S. citizen employee can be promoted, and (3) a non-U.S. citizen employee can be retained. The following guidelines apply to these evaluations.

When Evaluation is Required – Evaluation under these guidelines normally is required at any time when:

1.  a non-U.S. citizen is elected for appointment or promotion to a position in the presence of a qualified U.S. citizen competitor; or

2.  a qualified U.S. citizen makes known to VOA his or her candidacy for a position either occupied by or equivalent to one occupied by a non-U.S. citizen unless the U.S. citizen is selected for such a position.

However, there is no requirement to evaluate a U.S. citizen:

1.  who is an Agency employee serving at the same or higher grade as the position proposed to be filled by a non-U.S. citizen unless the position has known documented promotion potential higher than that of the U.S. citizen's position;

2.  who is an Agency or other U.S. Government employee whose most recent performance appraisal in a position with similar duties or with performance elements directly related to the knowledge, skills, abilities, or other characteristics critical to performance in the position proposed to be filled by a non-U.S. citizen indicates an overall rating below the "fully successful" level;

3.  who is an Agency or other U.S. Government employee whose most recent performance appraisal indicates a rating below the "fully successful" level in an element which is directly related to knowledge, skill, ability, or other characteristic critical to performance in the position proposed to be filled by a non-U.S. citizen; or

4.  who has been separated or resigned after being notified that he or she would be separated from the most recently held related employment for performance or conduct reasons.

Determinations of Relative Qualifications—A non-U.S. citizen may be selected, promoted, or retained in the presence of qualified U.S. citizen competitors if, after full and fair consideration of all candidates against the job requirements, the selecting official determines that the non-U.S. citizen is better qualified than any U.S. citizen competitor and the superior qualifications of the non-U.S. citizen are supported by acceptable written documentation provided by the selecting official. In no case, however, may a non-U.S. citizen (employee and applicant) be selected or promoted under circumstances which would not permit the action for a U.S. citizen.

Consideration and Evaluation of Candidates—In making determinations of relative qualifications, the selecting official should evaluate candidates according to job-related factors having a direct relationship to individuals' qualifications and fitness for the position. Examples of such factors include but are not limited to:

NYUNT - EEOC No. 100-2004-0921X
Interr. #9 Doc. Req #3

- The relatedness of candidates' overall education and experience backgrounds to the work of the position;

- The level of responsibility exercised and quality of work produced in previous jobs;

- Awards and other professional or academic recognition received;

- Specific professional accomplishments or a pattern of overall professional accomplishments and advancement to positions of greater responsibility;

- Recency of experience when current knowledge in a job-related area can be shown to have a bearing on qualifications;

- Traits related to quality of performance and versatility, such as initiative, willingness to take and follow instructions, reliability and dependability and interpersonal communication skills;

- The ability to contribute to the overall operating efficiency and effectiveness of the organization or work unit; and

- Quality of past performance in specific job-related functions.

Sources of information on which evaluations may be based include but are not limited to:

- Application forms;
- Reference checks;
- Examination results;
- Writing samples and voice auditions;
- Performance appraisals; and
- Interviews.

Written Documentation – To be acceptable, written documentation must:

- clearly establish the superior qualifications of the non-U.S. citizen candidate or employee;
- be based solely on job-related criteria; and
- be based on a full and fair evaluation of all candidates. A full and fair evaluation normally includes a complete and objective evaluation of all available, pertinent application and performance documents and a personal interview when appropriate.

Approval of Actions

To obtain approval for selections, promotions, or retentions of non-U.S. citizens in the presence of U.S. citizen competitors, the selecting official will transmit the case file, along with written documentation in support of the proposed action, by memorandum through his or her division chief to the Chief, Operations Division, Office of Personnel (VOA/PO). The Chief, VOA/PO will either (1) approve the proposed action and notify the selecting official and division chief, of (2) recommend disapproval and forward the case to the Director of Personnel (VOA/P). The Director of Personnel may approve the proposed action or, jointly with the Director of Programs (VOA/B), disapprove the proposed action.

_____                              _____
John S. Welch                                    Effective Date
Director of Personnel

Calendar No. 611

| 97TH CONGRESS<br>2d Session | } | SENATE | { | REPORT<br>No. 97–429 |

*See p. 2*

# INTERNATIONAL COMMUNICATION AGENCY AUTHORIZATION ACT, FISCAL YEAR 1983

MAY 26 (legislative day, MAY 25), 1982.—Ordered to be printed

Mr. BAKER (for Mr. PERCY), from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany S. 2581]

The Committee on Foreign Relations, having had under consideration an original bill (S. 2581) to authorize additional appropriations for the fiscal year 1983 for the operations of the International Communication Agency, and for other purposes, reports favorably thereon and recommends that the bill do pass.

## BACKGROUND

The International Communication Agency (ICA) was established by Reorganization Plan No. 2 of 1977 and began operations on April 1, 1978. It is based on a consolidation of the former U.S. Information Agency and the former Bureau of Educational and Cultural Affairs of the Department of State. Its legislative mandate derives from the Smith-Mundt Act of 1948 and the Fulbright-Hayes Act of 1961. The purpose of the former act is to "increase mutual understanding between the peoples of the United States and the people of other countries." It also prohibits dissemination within the United States of materials produced for distribution overseas. The latter act delineates how the nation's educational and exchange programs should be administered.

## PURPOSE

The primary purpose of this legislation is to provide an authorization of appropriations of $559,000,000 for the operations of ICA for fiscal year 1983. This amount represents an increase of $76,660,000 over the amount the Administration originally requested which was contained in S. 1193, a bill pending before a House–Senate Conference which passed the Senate on June 18, 1981. The Executive Branch stated that this increase is necessary primarily to cover "added requirements for construction of new Voice of America relay stations over-

**ATTACHMENT C**

002016

2

seas, international education and foreign language activities to be transferred from the Department of Education and added costs of Agency operations attributable mainly to overseas wage cost increases."

## OTHER PROVISIONS OF THE BILL

The bill also contains provisions which make certain changes in administrative authorities which have been requested by the Administration. These provisions would accomplish the following:

(1) Permit the International Communication Agency to credit tuition fees and other payments received in connection with the Agency's English-teaching programs to ICA's applicable appropriation; and

(2) Clarify the authority of the heads of foreign affairs agencies to establish procedures for the movement of senior foreign service officers from one senior executive service level to another within class without the need for reconfirmation.

## COMMITTEE COMMENTS

In addition to the various authorities contained in this bill, the Administration requested an amendment to section 804(1) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1474(1)) to clarify ICA's authority to employ aliens for translation and narration or preparation and production of foreign language programming. ICA requested an amendment to the law to enable the Agency to employ aliens when "equally or better" qualified U.S. citizens were not available.

Under existing law, ICA may employ aliens when "suitably" qualified U.S. citizens are unavailable for employment. The phrase "suitably qualified" has, because of the lack of legislative history on the issue, been interpreted by the Agency as "minimally qualified," mandating the employment of U.S. citizens over more highly skilled foreign nationals.

It is the view of the Committee that the phrase "suitably qualified," if interpreted in a sensible and intelligent manner, is more than adequate to protect the staffing needs of Voice of America. The problem with respect to the employment of foreign nationals was created by an incorrect administrative interpretation of existing law and should be remedied through administrative, not legislative action. The Committee views the Administration's requested amendment on this issue as unnecessary and urges the Agency to correct its hiring policy accordingly.

### PERFORMANCE PAY

Senator Pell introduced two amendments regarding implementation of the provisions on performance pay for Senior Foreign Service Officers in the Foreign Service Act of 1980. Senator Pell noted that a dispute has arisen between the International Communication Agency and the exclusive employee bargaining representative, the American Federation of Government Employees (AFGE), over this issue. The amendments introduced by Senator Pell were designed to clarify the Congressional intent with respect to the composition and authority of the selection boards on performance pay and the negotiability of these issues between the Agency and the exclusive representative.

In view of the fact that the ICA-AFGE dispute is currently before the Foreign Service Labor Relations Board, the Committee decided

002017

3

that consideration of Senator Pell's amendments would be premature.
Senator Pell expressed his hope, and Senator Percy concurred, that
this matter would be resolved in the next few weeks. If not, Senator
Pell indicated that he would ask for reconsideration of his amendments
when the Committee considers the Administration's package of
amendments to the Foreign Service Act of 1980, which is expected to
be submitted by June. The Committee agreed that it would be desir-
able to hold a hearing before acting on Senator Pell's amendments
given the complexity of this issue.

### SECTION-BY-SECTION ANALYSIS

### SECTION 1—SHORT TITLE

This section entitles this Act the "International Communications
Agency Authorization Act, Fiscal Year 1983."

### SECTION 2(A)—AUTHORIZATION OF APPROPRIATIONS

This subsection authorizes an appropriation of $559,000,000 for the
International Communication Agency for fiscal year 1983. Originally,
the Administration requested $644,000,000 authorization for FY 1983.
However, in reviewing the Administration's justification materials, the
Committee took note of the following facts: (a) ICA intends to obli-
gate in FY 1983 only $40 million of the $115 million it requests for
the acquisition and construction of radio facilities; and (b) of the ad-
ditional $43 million requested by ICA for its salaries and expenses ac-
count, over $30 million is already provided for in permanent authority
contained in legislation (S. 1193) pending before a House-Senate Con-
ference. Consequently, the Committee adopted a proposal offered by
Senators Percy and Pell which eliminates both the $75 million in ex-
cess autority for radio construction and the $30 million in excess for
the salaries and expenses account.

In addition to this reduction of $105 million, the Committee added
$20 million to the Administration's proposal for the educational ex-
change programs. In taking this action, the Committee agreed to an
amendment offered by Senator Pell and cosponsored by Senators
Percy, Mathias, Zorinsky, Tsongas and Dodd to earmark $120,600,000
for the Educational and Cultural Affairs (ECA) Directorate of ICA
for the fiscal year 1983 with specific earmarks of $84,256,000 for the
Fulbright Academic Exchange programs and the International Vis-
itor Program, $3,248,000 for the Humphrey Fellowship Program and
$8,906,000 for grants to private, not-for-profit organizations engaged
exchange-of-persons programs. The $120,600,000 earmark for ECA is
an increase of $20,000,000 over the Administration's request and is
consistent with the action of the Committee and the Senate in mandat-
ing that ICA increase, in real terms, its exchange-of-persons programs
threefold over the next four years.

The Committee felt an earmark was appropriate because ICA had
ignored the FY 82 continuing resolution conference report earmark-
ing $100,000,000 for exchanges in fiscal year 1982. The Committee was
also concerned over the Administration's failure to implement Section
203 of the Foreign Relations Authorization Act of 1979, mandating a
significant expansion of exchanges over a four-year period beginning
October 1, 1979.

002018

4

In increasing the Educational and Cultural Affairs Directorate's budget, the Committee specified that $19,400,000 of the increase should go to four established programs that have a proven record of effectiveness. These programs are:

The Fulbright Program which has brought 80,000 foreign scholars to the United States and sent 40,000 Americans abroad;

The International Visitor Program which usually brings some 1,500 future leaders to the United States and the alumni of which includes 33 current heads of state, 378 current cabinet ministers, and such leaders as the late President Sadat, former French President Giscard d'Estaing, and Chancellor Schmidt;

The Humphrey Fellowship Program which is new, but which has proven its effectiveness in bringing managers from the Third World to the United States for training in public administration; and

The private sector program which provides seed money to the many private organizations engaging in exchange-of-persons programs such as Sister Cities, Youth for Understanding, Operation Crossroads Africa, and the American Council of Young Political Leaders.

In increasing the funds available for grants to private organizations engaged in exchanges, it is the intent of the Committee that the increase be primarily used to support organizations and projects which have proven their effectiveness in years past in this program.

In earmarking the funds to increase exchange programs, the Committee noted that the Administration's request included over $80 million in authorizations which was not to be obligated in FY 83. Thus, the earmark could be made without subtracting from other important ongoing ICA activities.

The Committee accepted a proposal offered by Senator Lugar to insure that, in the event the appropriations were not sufficient to fund ongoing operations of ICA, ECA would not be unduly advantaged over other programs. Senator Lugar's proposal reduces the earmark for ECA and for the specific programs within ECA by the percentage that appropriated or otherwise made available funds are less than the amounts authorized in this bill, except that the earmarks shall not be reduced where the appropriations bill makes reductions against particular programs.

This proposal is not intended to provide ICA with reprogramming authority of any kind. The Committee notes that the earmarks for exchange-of-persons programs are floor level. Even if Senator Lugar's formula should lower these floor levels, ICA would still be obliged to expend funds at any higher level set by any appropriations legislation.

The following table compares the funding of ICA contained in the legislation now pending in Conference (S. 1193 and H.R. 4814) for fiscal year 1982 and fiscal year 1983, the President's revised fiscal year 1983 request, and the Committee's recommendation.

002019

5

U.S. INTERNATIONAL COMMUNICATION AGENCY—COMPARISON OF 1983 BUDGET REQUEST WITH AMOUNTS
IN H.R. 4814 AND S. 1193

[Funds in thousands]

| Account | 1982 request as amended March 1981 and approved in H.R. 4814 and S. 1193 | | 1983 request as amended March 1981 and approved H.R. 4814, S. 1193 | 1983 request per President's 1983 budget, February 1982 | Committee recommendation |
|---|---|---|---|---|---|
| | H.R. 4814 | S. 1193 | | | |
| Salaries and expenses: | | | | | |
| Overseas missions | 138,510 | 146,194 | 146,194 | 150,777 | 150,777 |
| Broadcasting service | 104,509 | 106,669 | 106,669 | 117,391 | 117,391 |
| Education and cultural affairs | 56,284 | 92,380 | 92,380 | 100,600 | 120,600 |
| Program coordination, production, and support | 37,877 | 39,456 | 39,456 | 46,664 | 46,664 |
| Agency direction and management | 34,071 | 33,412 | 33,412 | 37,665 | 37,665 |
| Administrative support from other agencies | 33,241 | 34,076 | 34,076 | 42,346 | 42,346 |
| Subtotal | 398,952 | 452,187 | 452,187 | 495,443 | 515,443 |
| Special foreign currency program | 9,110 | 11,451 | 11,451 | 11,327 | 11,327 |
| Committee cut | | | | | −30,000 |
| Total, salaries and expenses | 408,062 | 463,638 | 463,638 | 506,770 | 496,770 |
| Acquisition and construction of radio facilities | 71,178 | 80,884 | 1,882 | 115,000 | 40,000 |
| Center for Cultural and Technical Interchange Between East and West | 14,854 | 16,880 | 16,880 | 18,230 | 18,230 |
| Tsukuba Expo | | | | 4,000 | 4,000 |
| Total, 1983 request | 434,034 | 561,422 | 482,340 | 644,000 | 559,000 |

The Committee's recommended authorization level for fiscal year 1983 is $85 million less than the President's fiscal year 1983 request submitted in February of this year. It is $76 million more than the President's original fiscal year 1983 request submitted in March of 1981. The following is an explanation of the major elements of that $76 million increase:

*Overseas missions:* −$9,057,000

$1,131,000 for higher average employment and other salary changes;

$760,000,000 to transfer funding of mission programs in Egypt to dollar funding due to lack of U.S. Government-owned Egyptian pounds;

savings of $819,000 resulting from program cuts implemented in fiscal year 1982; and

all other net built-in changes resulting in a net savings of $10,129,-000 due primarily to favorable exchange rate changes in fiscal year 1982.

*Broadcasting service:* +$8,833,000

$4,600,000 for domestic price increases and other built-in require-ments necessary to maintain VOA programs throughout fiscal year 1983;

$3,562,000 for higher average employment and other salary changes in fiscal year 1982;

$485,000 for added transmission and talent costs related to expan-sion of Polish broadcasts by 35 hours weekly;

002020

6

Savings of $1,100,000 from program cuts implemented in fiscal year 1982; and

All other net built-in changes resulting in a net savings of $3,720,000 resulting mainly from favorable exchange rate changes in fiscal year 1982.

*Educational and cultural affairs: +$24,155,000*

$2,509,000 for domestic price increases and other net built-in requirements necessary to maintain these programs in fiscal year 1983;

$1,566,000 for higher average employment ($1,034,000), and other built-in changes in fiscal year 1982 ($532,000); and

$20,000,000 for the enhancement of the educational exchange programs.

*Program coordination, production and support: +9,091,000*

$2,997,000 for higher average employment and continuation of the Foreign Service comparability pay increase to domestic Foreign Affairs Specialist employees ($2,567,000), and expansion of TV satellite programs ($430,000);

$3,000,000 enhancement for weekly transmittal of television programs by satellite to overseas audiences of selected policy statements, backgrounders and analyses of events relevant to U.S. Government Policy;

$390,000 for all other net program and built-in requirements, primarily to offset a decrease in prior year balances available for application to programs in fiscal year 1983;

savings of $1,296,000 for program cuts implemented in fiscal year 1982; and

$4,000,000 to fund U.S. participation in the Tsukuba Expo '85.

*Agency direction and management: +$2,887,000*

$1,959,000 for higher average employment and other changes;

$564,000 for domestic price increases, within-grade advancements, and other built-in changes in fiscal year 1982 and anticipated in fiscal year 1983;

$1,044,000 to enhance reception of the Agency's Wireless File transmissions overseas ($1,040,000) and augmentation of the Entertainment in the U.S. allowance ($4,000); and

savings of $680,000 for program cuts implemented in fiscal year 1982.

*Administrative support from other agencies: +$7,597,000*

$941,000 for net changes in fiscal year 1982 requirements, mainly to expand office space for the Voice of America and added administrative support payments for programs in France, Brazil and Saudi Arabia;

$3,646,000 for added payments to the Department of State and the General Services Administration to cover projected cost increases in fiscal year 1983; and

$3,010,000 for program enhancements, mainly to consolidate USICA office space in Washington.

*Special foreign currency programs: −$1,374,000*

This net decrease results from favorable exchange rate changes and other net built-in savings in fiscal year 1982, partially offset by projected wage and price increases in fiscal year 1983.

Mar-22-07   15:26   From-BBG\GC                    +2022034585      T-664  P.008/022  F-915
Case 1:06-cv-01152-JDB      Document 13-5      Filed 04/06/2007      Page 22 of 36

7

*Acquisition and construction of radio facilities:* +$38,178,000

This amount includes $28,475,000 for the continuation of the construction of new high-power transmitting facilities in Sri Lanka and Botswana. An additional $9,703,000 is required to provide for the following changes: (1) $5,860,000 to reequip 19 of VOA's 26 domestic studios with new state-of-the-art equipment; (2) $500,000 to modernize VOA's Washington plant; (3) $930,000 to construct a VOA-owned satellite interconnect network to feed programs from Washington to the domestic relay stations and from U.S. based correspondent bureaus to Washington;

(4) $2,288,000 for land rental payments ($1,061,000) and purchase of antennas and associated equipment ($1,227,000) for the Government of Greece pursuant to recent negotiations to extend the agreement for maintenance of VOA relay stations there; and (5) $125,000 for other changes, mainly rental payments for the proposed transmitting facilities in the Caribbean.

*Center for cultural and technical interchange between East and West:* +$1,350,000

The increase in this account is requested to meet additional mandatory costs for staff and programs that will continue in effect through 1983. These cost increases consist of $426,000 to maintain Federal comparability in personnel compensation and $171,000 for other net salary changes; $461,000 for increased costs of participants; and $292,000 for increased costs of utilities, supplies and materials and other services.

### SECTION 3—USE OF ENGLISH-TEACHING PROGRAM FEES

This section grants ICA the authority to credit tuition fees and other payments received in connection with the Agency's English-teaching programs to its applicable appropriations. Under present practice, ICA is required to return to the Treasury any proceeds it collects as a result of its activities. At present, many of these programs are run under contracts with binational centers overseas where ICA's authority is limited. If ICA is permitted to use the proceeds of its programs, it will be able to strengthen its program control and financial oversight. Annual proceeds from such programs are estimated at $200,000 for the first year and up to $500,000 in succeeding years. The authority provided in this section may be exercised only to the extent that it is approved in appropriations acts.

### SECTION 4—BASIC SALARY RATES FOR SENIOR FOREIGN SERVICE

Section 4 clarifies the authority of the heads of foreign affairs agencies to establish procedures for the movement of senior foreign service officers from one senior executive service level to another within class without the need for reconfirmation.

The Justice Department has interpreted the Foreign Service Act of 1980 as requiring Presidential reappointment and Senate reconfirmation for a senior foreign service member moved from one pay level to another, even within a class. In contrast, in the Senior Executive Service, such movement is permitted through administrative action by the head of agency. The reconfirmation process would be cumbersome and inconsistent with the effort made in the Foreign Service Act to reduce

002022

8

the number of confirmations necessary for advancement. In addition, if used, it would place undue emphasis on the pay levels at the expense of the well-established classes carried over from the Foreign Service Act of 1946.

## COMMITTEE ACTION

On March 23, 1982, the Director of the U.S. International Communication Agency, the Honorable Charles Z. Wick, transmitted to the President of the Senate Executive Communication 3059 which contained a draft bill to provide an additional authorization of appropriations for fiscal year 1983 for the International Communication Agency, and for other purposes. On April 26, 1982, Mr. Wick transmitted another executive communication (E.C. 3295) containing draft legislation to authorize the appropriations to fund U.S. participation at the Tsukuba Expo '85. Both executive communications were referred to the Committee on Foreign Relations.

The Committee held a public hearing on the proposal contained in E.C. 3059 on April 19th during which testimony was received from Mr. Wick presenting the Administration's justification for this legislation.

The Committee held an open mark-up session on May 6th at which time a working quorum amended and approved various provisions of the Administration's requested legislation. On May 11th, the bill adopted by the working quorum was ordered reported as a clean bill by a voice vote by a live quorum of the full Committee.

## COST ESTIMATE

In accordance with Rule XXVI, paragraph 11(a) of the Standing Rules of the Senate, the Committee provides the following estimate of the cost of this original bill, prepared by the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 13, 1982.*

Hon. CHARLES H. PERCY,
*Chairman, Committee on Foreign Relations, U.S. Senate,*
*Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the following cost estimate on a bill to provide additional authorization of appropriations for the fiscal year 1983 for the International Communications Agency, and for other purposes, as ordered reported by the Senate Committee on Foreign Relations on May 11, 1982.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

ALICE M. RIVLIN, *Director.*

## CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

1. Bill number: S.
2. Bill title: A bill to provide additional authorization of appropriations for the fiscal year 1983 for the International Communications Agency, and for other purposes.

3. Bill status: As ordered reported by the Senate Foreign Relations Committee on May 11, 1982.

4. Bill purpose: This legislation authorizes the appropriation of $559 million for the International Communication Agency (ICA) for fiscal year 1983; permits the crediting of tuition fees and other payments received by the ICA to the Agency's appropriations, to the extent provided in advance in an appropriation act; and amends the Foreign Service Act of 1980.

5. Cost estimate:

Authorization level:

| Fiscal year: | Millions |
| --- | --- |
| 1983 | $559 |
| 1984 | 0 |
| 1985 | 0 |
| 1986 | 0 |
| 1987 | 0 |

Estimated outlays:

| Fiscal year: | |
| --- | --- |
| 1983 | 427 |
| 1984 | 113 |
| 1985 | 19 |
| 1986 | 0 |
| 1987 | 0 |

6. Basis for estimate: The estimate assumes enactment of this legislation and subsequent appropriation of the authorization amounts by September 30, 1982. Outlays were estimated by using the Administration's outlay rates.

Section 3 of the bill authorizes the crediting of fees and other payments received by the ICA from its English-teaching program to the Agency's appropriation. This section would permit the ICA to undertake new arrangements for its English-teaching program and finance the program with offsetting collections from non-federal sources.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Joe Whitehill (226-2840).

10. Estimate approved by:

JAMES BLUM, *Assistant Director for Budget Analysis.*

### EVALUATION OF REGULATORY IMPACT

In accordance with Rule XXVI, paragraph 11(b) of the Standing Rules of the Senate, the Committee has concluded that there is no regulatory impact from this original bill.

### CHANGES IN EXISTING LAW

In compliance with paragraph 12 of Rule XXVI of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman): 🌣.

UNITED STATES INFORMATION AND EDUCATIONAL EXCHANGE OF 1948

*   *   *   *   *   *   *

002024

## TITLE VIII—ADMINISTRATIVE PROCEDURES

* * * * *

### USE OF ENGLISH-TEACHING PROGRAM FEES

*Sec. 808. Notwithstanding section 3617 of the Revised Statutes of the United States (31 U.S.C. 484) or any other law or limitation of authority, tuition fees or other payments received by or for the use of the International Communication Agency from or in connection with English-teaching programs conducted by or on behalf of the Agency under the authority of this Act or the Mutual Educational and Cultural Exchange Act of 1961 may be credited to the Agency's applicable appropriation to such extent as may be provided in advance in an appropriation Act.*

* * * * *

## FOREIGN SERVICE ACT OF 1980

* * * * *

## TITLE 4 COMPENSATION

* * * * *

Sec. 402. Salaries of the Foreign Service.—[(a)] *(a) (1)* The President shall prescribe salary classes for the Senior Foreign Service and shall prescribe an appropriate title for each class. *The President shall also prescribe one or more basic salary rates for each class.* Basic salary rates for the Senior Foreign Service may not exceed the maximum rate or be less than the minimum rate of basic pay payable for the Senior Executive Service under section 5382 of title 5, United States Code, and shall be adjusted at the same time and in the same manner as rates of basic pay are adjusted for the Senior Executive Service.

*(a) (2) The Secretary shall determine which of the basic salary rates prescribed by the President under paragraph (1) for any salary class shall be paid to each member of the Senior Foreign Service who is appointed to that class. The Secretary may adjust the basic salary rate of a member of the Senior Foreign Service not more than once during any 12-month period.*

(b) (1) An individual who is a career appointee in the Senior Executive Service receiving basic pay at one of the rates payable under section 5382 of title 5, United States Code, and who accepts a limited appointment in the Senior Foreign Service in a salary class for which the basic salary rate is less than such basic rate of pay, shall be paid a salary at his or her former basic rate of pay (with adjustments as provided in paragraph (2)) until the salary for his or her salary class in the Senior Foreign Service equals or exceeds the salary payable to such individual under this subsection.

(2) The salary paid to an individual under this subsection shall be adjusted by 50 percent of each adjustment, which takes effect after the appointment of such individual to the Senior Foreign Service, in the basic rate of pay at which that individual was paid under section 5382 of title 5, United States Code, immediately prior to such appointment.

O

002025

97th Congress } HOUSE OF REPRESENTATIVES { REPORT
2d Session                                  No. 97-480

*See pp 2-4*

# ADDITIONAL AUTHORIZATIONS OF APPROPRIATIONS FOR THE FISCAL YEAR 1983 FOR THE INTERNATIONAL COMMUNICATION AGENCY, AND FOR OTHER PURPOSES

APRIL 2, 1982.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. FASCELL, from the Committee on Foreign Affairs, submitted the following

# REPORT

[To accompany H.R. 5998]

[Including cost estimate of the Congressional Budget Office]

The Committee on Foreign Affairs, to whom was referred the bill (H.R. 5998) to provide additional authorizations of appropriations for the fiscal year 1983 for the International Communication Agency, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## COMMITTEE ACTION

On March 18, 1982, the Director of the U.S. International Communication Agency, Hon. Charles Z. Wick, sent to the Speaker of the House of Representatives Executive Communication 3163 which contained a draft bill to provide additional authorizations of appropriations for the fiscal year 1983 for the International Communication Agency, and for other purposes. On March 25, 1982, the Assistant Secretary of State for Congressional Relations, Hon. Powell A. Moore, sent to the Speaker of the House of Representatives Executive Communication 3520 containing draft legislation to amend 22 U.S.C. 2653 as well as the executive pay schedule in order to make certain changes in administrative authorities which would confirm, in law, existing practice regarding the treatment of the rank of Counselor within the Department of State. These communications were referred to the Committee on Foreign Affairs, and on March 23 and 30, respectively, the chairman, Hon. Clement J. Zablocki, referred them to the Subcommittee on International Operations.

The Subcommittee held a hearing on March 17, 1982, during which testimony was received from representatives of the Department of State and the International Communication Agency. Among the

89-006 O

**ATTACHMENT D**

002026

witnesses were the following: Hon. Richard T. Kennedy, Under Secretary of State for Management; Hon. Charles Z. Wick, Director of the International Communication Agency; and Mr. James Conkling, Director of the Voice of America.

The subcommittee held an open markup session on March 25, 1982, on the draft legislation and reported to the full committee a draft bill in the form of a committee print. The full committee, on March 31, held an open markup of the draft bill and agreed to to the introduction of a clean bill H.R. 5998 was subsequently introduced by Hon. Dante B. Fascell, chairman of the Subcommittee on International Operations, and 15 cosponsors. On April 1, 1982, H.R. 5998 was ordered favorably reported by voice vote.

## PURPOSE OF THE BILL

The principal purpose of H.R. 5998 is to provide additional authorization of appropriations for fiscal year 1983 for the International Communication Agency to enhance the U.S. public diplomacy effort—the manner in which the United States can transmit its message worldwide, facilitate the free flow of information, and promote understanding and acceptance of U.S. positions through both its broadcasts and international education and cultural exchange programs.

## OTHER PROVISIONS OF THE BILL

The bill also contains provisions which make certain changes in administrative authorities which have been requested by the agencies or recommended by the committee. These provisions would accomplish the following:

(1) Permit the International Communication Agency to credit tuition fees and other payments received in connection with the agency's English teaching programs to ICA's applicable appropriation; and

(2) Exempt Inter-American Foundation grantees from the obligation to return to the U.S. Treasury interest earned on advances of appropriated funds.

## COMMITTEE COMMENT

The committee considered a request to amend section 804(1) of the United States Information and Educational Exchange Act of 1948 (23 U.S.C. 1474(1)) to clarify ICA's authority to employ aliens for translation and narration or preparation and production of foreign language programing. ICA requested an amendment to the law to enable the Agency to employ aliens when "equally or better" qualified U.S. citizens were not available.

Under existing law, ICA may employ aliens when "suitably" qualified U.S. citizens are unavailable for employment. The phrase "suitably qualified" has, because of the lack of legislative history on the issue, been interpreted by the Agency as "minimally qualified," mandating the employment of U.S. citizens over more highly skilled foreign nationals. The Senate report on the Foreign Relations Authorization Act for fiscal years 1980 and 1981 states that, "By law, should

a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position." On the other hand, the House report language offers a different, more flexible description, citing the severe problems encountered by ICA in recruiting U.S. citizens and recognizing that a number of tasks "can properly be performed by alien employees who are qualified and have the proper security clearances" when suitably qualified U.S. citizens are not available. The more specific dictates of the Senate report appear to require VOA to terminate the employment of a qualified alien (or to move that person laterally to a potentially less important job within the Agency) in order that a lesser or "minimally" qualified U.S. citizen be employed or promoted. In fact, the committee does not view the language in the House and Senate reports as contradictory, provided the term "suitably qualified U.S. citizen" is interpreted sensibly. The term should be interpreted to mean, in effect, that the person who best fulfills the job requirements would be hired, and that only in those cases where the American and the foreign national are equally qualified should preference be given to an American. Moreover, the committee sees no reason why an alien should be separated from employment or transferred to another position because of the availability of a U.S. citizen, on the basis of citizenship alone.

USICA's present interpretation apparently protects only a few employment opportunities for Americans. This is done to the detriment of the quality of VOA's programing overseas. In view of the U.S. Government's large investment in its international broadcasting effort, it is not in the interest of the United States or of U.S. citizens to jeopardize the quality of such programing in order to insure that "minimally" qualified Americans fill every possible position. The ability to communicate information accurately in a foreign language hinges on language capability which includes an idiomatic grasp of the language, not just textbook knowledge. International broadcasting is a competitive field which requires the best possible staff to attract and maintain an overseas audience. The quality of U.S. broadcasts reflects the quality of the message and the seriousness of our intent in broadcasting. Mistakes hamper our effectiveness and our competitiveness, and may offend our intended audience. Indeed, the committee has, over the years, been aware of criticisms of VOA broadcasts which indicate that some VOA broadcasters have not possessed an adequate grasp of the necessary language.

It is the view of the committee that the phrase "suitably qualified" is adequate to reflect the staffing needs of VOA, if interpreted correctly. In fact, "suitable" in itself means "qualified" and should be applied to those who are able to present a quality product. A suitably qualified person does not mean one who is qualified under minimum standards, but a person whose skills match the demands of the position as well as the demands of the Agency. Such an interpretation should allow ICA more flexibility in obtaining the staff needed to fulfill its

The committee notes that this bill contains no fiscal year 1983 supplemental authorization request for the Department of State. The committee has decided that additional authorization is unnecessary at this time, given the unusual circumstances which have left the fiscal

year 1982-83 authorization bill pending in conference. The following letter from Hon. Richard T. Kennedy, Under Secretary of State for Management, explains the fiscal year 1982-83 budgetary situation, which assumes enactment of the pending authorization bill:

UNDER SECRETARY OF STATE FOR MANAGEMENT,
*Washington, D.C., March 24, 1982.*

Hon. DANTE B. FASCELL,
*Chairman, Subcommittee on International Operations, Committee on Foreign Affairs, House of Representatives*

DEAR DANTE: I very much appreciate appearing before your Subcommittee last week to explain the Department of State's 1983 budget. As always, we value your strong support, most especially during this long legislative process. I trust my testimony gave a clear picture of our adjusted 1982 and 1983 requirements.

As a matter of practice to avoid confusion, the initial authorization bill has traditionally been presented at the same funding levels as our initially proposal appropriations. However, there have been many subsequent changes to the 1982 and 1983 budgets. Since the bill pending before the Congress covers two years, I would like to review its relationship to the revised 1982 budget figures and the new 1983 appropriation request.

In the context of this review, the 1982 and 1983 amounts authorized for the Department in the pending bill, when combined with existing permanent authorities, are sufficient to cover the revised appropriation requirements. These permanent authorities entail international peacekeeping activities, increases for American salaries, Foreign Service National wages, and the Foreign Service Retirement Fund. I will elaborate further on these authorities below.

For 1982, the bill contains ample authorization to cover the Department's appropriation levels in the Continuing Resolution, as well as for pending and proposed supplemental appropriations. As can be seen from the table at Attachment 1, we would have $68 million more authorization than appropriations in the House version of our bill and $225 million more in the Senate version. In this table we have included $13 million for 1982 supplemental requests (primarily for the United States-Iranian Claims Tribunal, the United States-Canada Maine Boundary dispute, and the Foreign Service Retirement Fund) and $22 million for Federal salary increases (which OMB has not yet transmitted to the Congress). Not included is $10 million in supplemental requests pending at OMB for protective security of U.S. diplomatic personnel overseas and of foreign diplomatic personnel in the United States following increased terrorist attacks on these two groups. However, even after adding these pending supplemental requests, I believe the bill provides sufficient authority in 1982 to meet the Department's requirements.

Concerning 1983, the amounts authorized for the Department in the House or Senate version of our authorization bill, when considered in conjunction with provisions of permanent authority contained in existing law, will provide sufficient authorization to meet our current and anticipated 1983 budget requirements. Specifically, Attachment 2 indicates there is $123 million in existing authorization above the

Funding levels for 1983 authorized by either the House or Senate from: Peacekeeping ($60 million); pay supplementals ($25 million); wages ($23 million); and Foreign Service Retirement Fund ($15 million).

This will cover the $10–17 current 1983 authorization "shortfall" indicated in Attachment 1, and also will provide authority to meet additional requirements not in our 1983 Congressional budget. The new items will total up to $70 million for such needs as increased overseas and domestic security ($48 million—a continuation of our 1982 supplemental request), peacekeeping ($10 million) and further Blair House renovations ($8 million).

Although this approach has been taken this year in view of the unusual circumstances involving the authorization legislation, the Department fully intends to continue to include these items in future fiscal year requests to the Committee. This unusual approach, of course, presupposes enactment of the fiscal year 1982–83 authorization legislation now pending in conference. As you know, the Department is eager to obtain a viable 1982–83 authorization bill, and I will make every effort to work closely with you to obtain it.

Sincerely,

RICHARD T. KENNEDY.

Attachments: Retained in Committee files.

### COUNSELOR OF THE DEPARTMENT OF STATE

Executive Communication 3520 requesting that the position of Counselor of the Department of State be upgraded from Executive Level IV to Executive Level III was submitted to Congress and jointly referred to the Committees on Foreign Affairs and Post Office and Civil Service on March 30, 1982. The Department of State further requested that such a provision be included in H.R. 5998.

During consideration of H.R. 5998, the committee noted that approval of the executive branch request on this matter would have the effect of increasing the number of level III positions in the Department of State at a time when the Department and other Federal agencies are undergoing severe personnel cuts and are making other budget sacrifices. In view of these reductions, the committee agreed that upgrading the position of Counselor of the Department without eliminating an existing level III position would be inappropriate at this time.

### SECTION-BY-SECTION ANALYSIS

#### SECTION 1—ADDITIONAL AUTHORIZATION OF APPROPRIATIONS FOR FISCAL YEAR 1983

This section amends the International Communication Agency Authorization Act, fiscal years 1982 and 1983, which is currently in conference, to authorize an additional appropriation of $157,660,000 for fiscal year 1983 to carry out the Agency's international communication, education, and cultural exchange functions. The following table provides a comparison of the executive branch fiscal year 1983 supplemental request with amounts contained in the Senate-passed bill, S. 1193, and the House amendment thereto, which is the fiscal years 1982

and 1983 authorization bill for the Department of State, the U.S. International Communication Agency, the Board for International Broadcasting, and the Inter-American Foundation.

**U.S. INTERNATIONAL COMMUNICATION AGENCY—COMPARISON OF 1983 BUDGET REQUEST WITH AMOUNTS IN H.R. 4814 AND S. 1193**

[In thousands of dollars]

| Account | 1983 request fiscal year 1981 [1] | 1982 supplemental request for fiscal year 1982 [2] | Increase (+) or decrease (—) |
|---|---|---|---|
| Salaries and expenses: | | | |
| Overseas missions | 146, 194 | 150, 777 | +4, 583 |
| Broadcasting system | 106, 669 | 117, 391 | +10, 722 |
| Educational and cultural affairs | 97, 390 | 100, 690 | +9, 370 |
| Program coordination and support | 39, 456 | 46, 464 | +7, 008 |
| Agency direction and management | 33, 412 | 37, 665 | +4, 253 |
| Administrative support from other agencies | 34, 076 | 42, 346 | +8, 276 |
| Special foreign currency program | 11, 451 | 11, 327 | —124 |
| | | | |
| Total, salaries and expenses | 467, 674 | 506, 776 | +43, 137 |
| Acquisition and construction of radio facilities | 1, 827 | 113, 000 | +113, 176 |
| Center for Cultural and Technical Interchange Between East and West | 16, 830 | 18, 230 | +1, 350 |
| | | | |
| Total 1983 request | 487, 340 | 640, 000 | +157, 640 |

[1] Submitted in March 1981 and approved in the House and Senate versions of the ICA fiscal year 1983 authorizations currently pending in conference (H.R. 4814 and S. 1193).
[2] Submitted on Mar. 18, 1982.

The Soviet Union presently outspends the United States by about 7 to 1 in international broadcasting and information efforts around the world, not to mention the additional millions of dollars it spends jamming U.S. broadcasts to the Soviet Union. The United States even ranks below some of its Western allies in broadcast hours around the world.

ICA's product is an important element in the U.S. national defense, a critical weapon in the war of ideas. Mutual understanding is a key element in the peace process and the effort to make information about the United States available to the world must be pursued vigorously if the United States is to maintain and promote the world's information balance.

Though U.S. arsenals of defense are stocked with state-of-the-art weaponry, the United States has neglected the technology of broadcasting and has relayed this Nation's message on transmitters which were "state of the art" in 1938. Therefore the committee feels that this supplemental request is not only justified, but overdue. Indeed, this new executive branch request approximates the committee's original fiscal year 1983 recommendation. The bulk of the supplemental (approximately $113.2 million out of $157.7 million) would be allocated to ICA's account for the acquisition and construction of radio facilities. Principally, these funds would be used to complete the construction of transmitting facilities for the Voice of America in Sri Lanka and Botswana, for broadcasting to Asia and Africa respectively, to reequip and modernize domestic broadcast studios, and to finance construction of a VOA-owned satellite network.

In addition to needed budget increase for plant and equipment and improvements in broadcast technology, the remainder of the supple-

mental would be allocated to fund, among other things, Federal pay raise costs, increased education and cultural affairs programing, the establishment of an ICA branch post in Guangzhou (Canton), China, and the consolidation of USICA office space in Washington, D.C.

The committee approves of the planned office space consolidation, which is long overdue. USICA now occupies 12 buildings in Washington, a circumstance which hampers efficiency and makes communication and day-to-day operations unusually difficult. The committee expects this move to be accomplished expeditiously and looks forward to receiving periodic progress reports.

The committee is concerned over allegations that education and cultural affairs programing is being subjected to political influences in derogation of the history, traditions, and intent behind the diverse programs administered by ICA. It is vital that these programs and the broadly representative nature of their participants be unimpeded by political considerations or wildly fluctuating budgetary priorities. Those involved in the business of promoting international understanding have realized that the United States should expend more than its current minuscule efforts in education and cultural exchanges. Therefore, it is imperative that existing programs of this sort be enhanced and expanded. By no means should they be sacrificed to newer, narrower initiatives of unconfirmed effectiveness. The goal should be to increase our efforts as much as possible so that the whole range of USICA's purposes is served.

Furthermore, the committee feels strongly that in order to fulfill effectively its assigned mission to foster mutual understanding, ICA must zealously protect the integrity and objectivity of its broadcasting efforts. The Voice of America must continue to reflect the best of American journalism, to tell the U.S. story clearly, honestly, and reliably. Only in this way will the United States be listened to, and its word respected.

Moreover, the committee supports USICA's efforts to combat disinformation through the dissemination of truth. It does, however, hope that such efforts can be made without harming the Voice's journalistic integrity and without mirroring aspects of the programs they are designed to counter. Some valid concerns have been voiced that a bolder marketing of America worldwide, a more obvious waving of the flag overseas, might damage that credibility as well as the goodwill among foreign audiences which USICA has built over the years. Credibility, in publications as well as in broadcasting, is USICA's best asset and our binding link to audiences worldwide.

The committee firmly supports a growing role for USICA in protecting U.S. interests abroad. It is the committee's hope that, in expanding USICA's reach, we can do so without changing the Agency's mission or threatening existing programs which already serve U.S. interests so well.

The committee further wishes to express its opposition to the Executive Committee of Correspondents' decision to withdraw accreditation to the Radio and TV Galleries of the House and Senate for correspondents of RFE/RL, Inc., as well as its continuing denial of accreditation to Voice of America correspondents. It appears that the committee reached that decision based on the fact that Radio Free

Europe and Radio Liberty are government-financed. By a fantastic leap in logic, they have thereby questioned the integrity and objectivity of the Radios. In addition, the Executive Committee seems to believe that RFE/RL, Inc., is controlled by the Department of State. In fact, the Radios' activities are carried out on a day-to-day basis in an entirely independent and objective manner, without any guidance or direction from the Department of State. Indeed, RFE/RL, Inc.'s research reports are so highly regarded that hundreds of news organizations, individuals, government agencies, and businesses around the world subscribe to them.

The committee is adamant in its belief that these organizations have been unfairly treated, not the least because the "Rules Governing the Radio and TV Correspondents Gallery" do not provide for the expulsion of a member. Moreover, it is highly questionable practice on the one hand, for the Executive Committee to attempt to expel RFE/RL, Inc., by questioning its independence, while on the other hand permitting foreign government-run operations such as Soviet radio and television to retain their accreditation. Indeed, the British Broadcasting Corp., Deutschewelle (Federal Republic of Germany) and French media entities are not only government-financed, but government-controlled. Finally, the committee urges that when the Executive Committee of Correspondents reconsiders its decision it also reconsider the reasons for which the Voice of America has always been denied accreditation. The Committee on Foreign Affairs believes that there is no justification for discrimination against U.S. media entities unless the same treatment is accorded foreign media entities which are government-financed or controlled.

### SECTION 2—USE OF ENGLISH-TEACHING PROGRAM FEES

This section would amend the United States Information and Educational Exchange Act of 1948 to provide the International Communication Agency with the necessary authority to use tuition and other payments received in connection with the agency's overseas English-teaching programs. Under present practice, USICA is required to return to the Treasury any proceeds it collects as a result of its activities. At present, many of these programs are run under contracts with binational centers overseas where USICA's authority is limited. If USICA is permitted to use the proceeds of its programs it will be able to strengthen its program control and financial oversight. Annual proceeds from such programs are estimated at $200,000 for the first year and up to $500,000 in succeeding years. The authority provided in this section may be exercised only to the extent that it is approved in appropriation acts.

### SECTION 3—INTEREST EARNED BY INTER-AMERICAN FOUNDATION GRANTEES

This section would exempt Inter-American Foundation (IAF) grantees from the obligation to return to the Treasury interest earned on advances of appropriated funds. This provision applies to interest earned both before and after date of enactment of the section.

Under present IAF practice, disbursements of grants are made at 6-month intervals, since most grants are under $75,000 and it would

be administratively costly and inefficient to make quarterly disbursements. Although great effort is made to disburse funds so as to minimize the time elapsing between transfer and grantee utilization, the entire disbursement may not be used immediately. In fact, it normally takes several weeks for the grantee to utilize all of the funds. In countries where the annual inflation rate has been as high as 100 percent, the real value of the money drops dramatically if the remaining funds are not permitted to earn interest, even for 2 or 3 weeks. Under current administrative interpretations, these organizations must return to the U.S. Treasury any earned interest. Not only is this practice confusing to the small, unsophisticated organizations which make up the bulk of IAF's grantees, but it would be more costly to the United States administratively to require the return of such small amounts of interest.

Instead, the committee feels that a much more practical and efficient procedure would be to permit grantees to utilize any such interest earned for the purposes for which the IAF grant was made. In this way, the Foundation's funding will not be as diminished by high inflation rates, the purposes of the Foundation will be served, the United States will save money, and the purposes of the individual grants will be enhanced. In addition, the committee wishes to stress that support for this exemption from the requirements of 31 U.S.C. 484 is based upon the unusual aspects of Foundation grantmaking and operations and is not intended to be a precedent for other agencies. Indeed, the committee does not feel that this exemption is inconsistent with the original intent behind enactment of 31 U.S.C. 484 which concerns congressional oversight and control of appropriated funds.

## REQUIRED REPORTS SECTION

### COST ESTIMATE

H.R. 5998 authorizes an additional appropriation of $157,560,000 for fiscal year 1983 for the International Communication Agency. The fiscal year allocation of the total cost of the bill is set forth in the Congressional Budget Office estimate below. Assuming the full appropriation of the amount authorized in H.R. 5998, the committee agrees with the projected cost estimate of the Congressional Budget Office.

### INFLATIONARY IMPACT STATEMENT

The additional amount authorized to be appropriated in H.R. 5998 is only 0.01 percent of the President's total budget authority request for fiscal year 1983. Thus, the bill, if enacted, would have no measurable inflationary impact.

### STATEMENTS REQUIRED BY CLAUSE 2(b)(3) OF HOUSE RULE XI

(a) Oversight findings and recommendations

Principal oversight activities which contributed to the formulation of H.R. 5998 included:

(1) Extensive hearings and review of the executive branch authorization request for the International Communication

Agency during the first session of the 97th Congress by the Sub committee on International Operations as well as the special hearing on the supplemental fiscal year 1983 authorization request for the International Communication Agency alluded to earlier in the report;

(2) Staff inspections of International Communication Agency overseas operations and Voice of America facilities; and

(3) Ongoing consultation between the committee members and staff and executive branch officials concerning the formulation and administration of U.S. international communication policy.

Based on these oversight activities, the committee recommends the adoption of H.R. 5998.

### (b) Budget authority

The enactment of H.R. 3566 will create no new budget authority.

### (c) Committee on Government Operations summary

No oversight findings and recommendations which relate to the measure have been received from the Committee on Government Operations under clause 4(c)(2) of rule X of the rules of the House.

### (d) Congressional Budget Office cost estimate

APRIL 2, 1982.

1. Bill Number: H.R. 5998.

2. Bill title: A bill to provide additional authorization of appropriations for the fiscal year 1983 for the International Communications Agency, and for other purposes.

3. Bill status: As ordered reported by the House Foreign Affairs Committee on April 1, 1982.

4. Bill purpose: This legislation authorizes the appropriation of $640 million for the International Communication Agency (ICA) for fiscal year 1983; permits the crediting of tuition fees and other payments received by the ICA to the Agency's appropriations, to the extent provided in advance in an appropriation Act; and permits the recipients of Inter-American Foundation grants to invest funds received in interest bearing accounts and use the interest earned for the same purposes for which the grant was made.

5. Cost estimate:

[By fiscal years, in millions of dollars]

|  | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Budget function 150: |  |  |  |  |  |
| Authorization amount | 640 | 0 | 0 | 0 | 0 |
| Estimated outlays | 534 | 123 | 62 | 19 | 2 |

6. Basis for estimate:

The estimate assumes enactment of this legislation and subsequent appropriation of the authorization amounts by September 30, 1982. Estimated outlays were taken from the President's January Budget.

The $640 million authorization is an increase of $157,660 thousand over the authorization contained in the conference report on S. 1193, the International Communications Agency Authorization Act, fiscal years 1982 and 1983. Since that legislation has not been enacted, the full authorization amount is shown in the cost estimate section.

Section 2 of the bill authorizes the crediting of fees and other payments received by the ICA from its English-teaching program to the Agency's appropriation. This section would permit the ICA to undertake new arrangements for its English-teaching program and finance the program with offsetting collections from non-federal sources.

Section 3 would permit recipients of Inter-American Foundation grants to use interest earned on advances for the same purposes for which the grant was made, rather than covering the interest to the U.S. Treasury as a miscellaneous offsetting receipt. The Foundation estimates that less than $300,000 in interest is affected and that additional staffing and collection procedures will greatly offset collections.

7. Estimate comparison: Authorization levels and estimated outlays are the same as the Administration.

8. Previous CBO estimate: None.

9. Estimate prepared by: Joe Whitehill.

10. Estimate approved by:

JAMES BLUM,
*Assistant Director for Budget Analysis.*

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## UNITED STATES INFORMATION AND EDUCATIONAL EXCHANGE OF 1948

*    *    *    *    *    *    *

## TITLE VIII—ADMINISTRATIVE PROCEDURES

*    *    *    *    *    *    *

### USE OF ENGLISH-TEACHING PROGRAM FEES

*Sec 808. Notwithstanding section 3617 of the Revised Statutes of the United States (31 U.S.C. 484) or any other law or limitation of authority, tuition fees or other payments received by or for the use of the International Communication Agency from or in connection with English-teaching programs conducted by or on behalf of the Agency under the authority of this Act or the Mutual Educational and Cultural Exchange Act of 1961 may be credited to the Agency's applicable appropriation to such extent as may be provided in advance in an appropriation Act.*

*    *    *    *    *    *    *

## FOREIGN ASSISTANCE ACT OF 1969

*    *    *    *    *    *    *

## PART IV—THE INTER-AMERICAN FOUNDATION ACT

Sec. 401. INTER-AMERICAN FOUNDATION.— (a)   *    *    *

*    *    *    *    *    *    *

002036