United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Kyaw Zaw Nyunt, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CA No. 06 – 1152 (JDB) |
| Kenneth Y. Tomlinson, | ) | |
| Chairman, | ) | |
| Broadcasting Board of Governors, | ) | |
| Defendant. | ) | |

**Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment**

**Introduction**

Plaintiff respectfully opposes Defendant's motion to Dismiss or, in the Alternative, for Summary Judgment ("Defendant's Motion").

In this action Plaintiff, an Asian American of Burmese national origin over the age of 58, complains of discrimination based on age, race, national origin and retaliation by the Broadcasting Board of Governors ("BBG") in violation of the Age Discrimination in Employment Act, 29 U.S.C. Section 623 *et seq*., Title VII of the Civil Rights Act, 42 U.S.C. section 2000e *et seq.* ("Title VII"), and 42 U.S.C. sections 1981 *et seq*.

Defendant's Motion seeks dismissal of Plaintiff's claims of race discrimination and retaliation under Title VII for alleged failure to exhaust remedies and claims under District of Columbia law and 42 U.S.C. section 1981 as barred by the exclusivity of Title VII. Defendant seeks dismissal of the claims of national origin discrimination and age discrimination as to one of the vacancies, VA 03 -26, as legally insufficient to state a *prima facie* case. As to both vacancies Defendant urges that Plaintiff cannot establish that

the agency actions were a pretext for discrimination. Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defendant's Memorandum").

Along with this opposition, Plaintiff is submitting a Statement of Material Facts As to Which there are Genuine Issues ("PSF") and a collection of supporting documents and affidavits. The documents, which are sequentially numbered in the lower left corner, will be referenced here by page number (e.g., "Attachments at [page] ").

This action centers on the non-selection of Plaintiff Kyaw Zaw Nyunt for a GS-12 international radio broadcaster ("IRB") position in VA 03-26 and for a GS- 12 international broadcaster ("IB") position in VA 03-29  in the Burmese service of BBG both of which were advertised in March, 2003.

There is no dispute that Plaintiff is an Asian American of Burmese descent over the age of 58; that he applied for two positions at BBG in 2003; that he was found to be eligible for those positions; that he was referred to the selecting official as eligible for selection for each vacancy; and that when BBG filled the positions, he was not selected. He satisfies the "not onerous" requirements of a *prima facie* case. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Nor is there any dispute that Plaintiff initiated a timely complaint of discrimination at the agency. See, e.g., Exhibit A to Defendant's Motion.

As set out below, there is more than ample direct and indirect evidence of discrimination and pretext to warrant denial of Defendant's Motion.

## II.    Legal Framework

In the absence of direct evidence of discrimination, disparate treatment claims of discrimination are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The burden of demonstrating a *prima facie* case is expressly "not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The *McDonnell Douglas* model of *prima facie* case is not intended to be "rigid, mechanized or ritualistic" because the requirements can vary depending on the facts. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002).

Under the standard formulation, the plaintiff must show that (i) he belongs to a protected class; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iii) that after his rejection the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802 (1973). The fourth prong of the test is revised for cases where the position is filled with another applicant. As matter of law, the group identity (i.e., the national origin or age) of the individual selected over plaintiff is not part of the plaintiff's *prima facie* case. If anything, the group identity of the selectee is part of the employer rebuttal but it is not dispositive.

Consistent with *McDonnell Douglas*, the District of Columbia Circuit has declared that the selection of another member of plaintiff's protected class is not prejudicial to a *prima facie* case. "It bears noting, however, that even in

failure-to-hire cases we impose no requirement that the employer filled the sought-after position with a person outside the plaintiff's protected class" to make a prima facie case. *Chappel-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) [1]

---

[1] In *Teneyck v. Omni Shoreham Hotel*, 365 F. 3d 1139, 1150 (D.C. Cir. 2004) the court stated:

> The decision in *Stella* [*v. Minetta*, 284 F.3d] also held that a plaintiff in a Title VII case is not required to show that she was disadvantaged in favor of a person outside of the protected class. 284 F.3d at 146. *In other words, in order to make out a prima facie case, it is not necessary for an African-American plaintiff to show that she was disadvantaged by the employer's hiring of a Caucasian applicant, or for a female plaintiff to show that a male was hired in her stead.* In reaching this result, *Stella* adopted the position followed by the vast majority of our sister circuits that have ruled on this issue. *Id.* at 145-46. The employer's hiring of a person of the same race or sex as the plaintiff might be relevant in assessing the merits of a plaintiff's claim beyond the stage of the *prima facie* case, but it is not a factor in the plaintiff's establishment of a *prima facie* case. As the Third Circuit noted in *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344 (3rd Cir. 1999), even if a plaintiff is replaced by someone within her class, she could still demonstrate that the employer treated her worse than others because she was a member of the protected class. *Id.* at 353. For example, a female employee may have been "treated differently from similarly situated male employees." *Id* at 353 -54.
>
>    *McDonnell Douglas* principally demands "that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Int'l Bhd. of Teamsters v United States*, 431 U.S. 324, 358 n.44 (1977). As the Supreme Court has noted, "elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.* Therefore, to require a Title VII plaintiff to show that someone outside of her protected class was hired or promoted in her stead would be to graft an additional element onto the *McDonnell Douglas* model of the *prima facie* case. *Stella* forecloses this possibility.
>
>    Once a *prima facie* case has been established, "the plaintiff in a Title VII action creates a rebuttable 'presumption that the employer unlawfully discriminated against' him." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 , 714 (1983) (quoting *Burdine,* 450 U.S. at 254). Establishment of a prima facie case triggers the employer's burden to produce admissible evidence that, if believed, would establish that the employer's action was motivated by a legitimate, nondiscriminatory reason. *Burdine,* 450 U.S. at 254-56.

(emphasis added).

Most circuits apply the same rule. See *Brown v. Henderson*, 257 F.3d 246, 252 (2nd Cir. 2001) ("discrimination against one employee cannot be cured, or disproven, solely by favorable or equitable, treatment of other employees of the same race or sex") citing *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996).

Accordingly, it is not part of Plaintiff's *prima facie* case to demonstrate that an individual outside his national origin, race or age group was selected for the position and the demonstration of that by the employer is not dispositive of the *prima facie* claim.

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. " *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 113, 120 (2000). Certainly, "evidence of discriminatory statements or attitudes on the part of the employer" may support a verdict for a title VII plaintiff. *Aka v. Washington Hospital Center*, 156 F3d. 1284, 1289 (D.C. Cir. 1998) (en banc).

A demonstration that the employer departed from common sense or its selection procedures is a classic basis for inference of intent to discriminate.

*Lathram v. Snow*, 336 F. 2d 1085, 1093-1094 (D.C. Cir. 2003) (holding that a jury could draw an inference of discrimination where the agency departed from its normal personnel process). In *Salazar v. WMATA*, 401 F 3d 504, ( D.C. Cir. 2005) the court reversed a dismissal of a discrimination complaint based on irregularities in the interview process. Even though the scores given to the plaintiff by the alleged discriminating official "differed little" from those given by the other panelists, the fact that the alleged discriminator had chaired the panel and drafted the questions was considered sufficient to permit the case to go to a jury. *Id*. at 507.

A motion for summary judgment gives the judge an initial opportunity to assess the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and judgment can be entered for the movant as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).The basic inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251 -252. An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id*. at 248. An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. *Id*. at 249. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate.

The movant's initial burden under Fed. R. Civ. P. 56 is to show the absence of evidence to support the nonmoving party's position. The movant must specify those

portions of the pleadings, depositions, answers to interrogatories and admissions on file,

together with affidavits if any, which demonstrate the absence of a genuine issue of fact.

See Fed. R. Civ. P. 56(c). It may be sufficient for the movant to establish that the alleged

factual issues are without legal significance.    *Anderson* at 250.

     In reviewing the evidence,

> the court must draw all reasonable inferences in favor of the
> nonmoving party, and it may not make credibility
> determinations or weigh the evidence. *Lytle v. Household
> Mfg., Inc.,* 494 U.S. 545, 554-555 (1990) … "Credibility
> determinations, the weighing of the evidence, and the
> drawing of legitimate inferences from the facts are jury
> functions, not those of a judge." *Liberty Lobby*, supra, at 255.
> Thus, although the court should review the record as a whole,
> it must disregard all evidence favorable to the moving party
> that the jury is not required to believe. See Wright & Miller
> 299. That is, the court should give credence to the evidence
> favoring the nonmovant as well as that "evidence supporting
> the moving party that is uncontradicted and unimpeached, at
> least to the extent that that evidence comes from disinterested
> witnesses." Id. at 300.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citations

omitted).

### III. Discussion

### A. Plaintiff  has satisfied the Requisite obligation to Exhaust with Respect to His Claims of Race Discrimination and Retaliation

     Plaintiff filed a timely administrative complaint of discrimination. Exhibit

A to Defendant's Motion.

     Defendant moves to dismiss plaintiff's claims of discrimination as to race

and retaliation for alleged failure to identify those theories in his initial complaint.

Further, Defendant seeks dismissal of Plaintiff's complaints regarding retaliation

in an admonishment and sick leave administration. Defendant's Memorandum at

9.

In his written complaint to the EEO counselor in the summer of 2003

Plaintiff declared that

> On June 13, Mr. Htay [the selecting official] asked us not
> to complain if we were not selected. He said if we
> complained, we would be blacklisted and we would never
> get promotions. Just minutes before he announced the
> selection of Mr. Myint, he even said that the
> unemployment rate was so high that it was difficult to get a
> waiter's job. Most of us understood that he meant if we get
> fired for complaining, it is difficult to get a job outside at
> this time. **Threatening to take a personnel action against
> an employee for making a complaint is a prohibited
> personnel practice.**

Exhibit A to Defendant's Motion at pg. 7 (emphasis in the original). A clearer

statement of retaliation could hardly be made. A complainant is merely required

to state the substance of his complaint at that stage. As Plaintiff Nyunt states in

his Affidavit at para. 3, 4, another employee at the meeting who complained to

the agency EEO officer of the threat was later removed from the federal service.

Plaintiff described the discrimination as against him as a "Burmese."

Exhibit A at pg. 2 - 4 to Defendant's Motion. Burmese is as much a racial

descriptor as national origin. There is no suggestion that the investigation of the

complaint would have been any different had he checked the race box on the form

as well as national origin.

In actions brought under Title VII and the ADEA, a court has authority over those

claims that are contained in the administrative complaint or claims "like or reasonably

related to" those claims. *Park v. Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1995).

It is the defendant's burden to prove by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies. *Brown v. Marsh,* 777 F.2d 8, 13 (D.C. Cir. 1985). Further,

> [t]he requirement of administrative exhaustion under Title VII is generally understood to serve the following purposes: (1) to place the employer on notice that its actions have been alleged to violate Title VII; (2) to allow the responsible agency to create a factual record; and (3) to afford employer and employee an adequate opportunity to pursue a mutually satisfactory resolution of the dispute.

*Keeley v. Small,* 2003 LEXIS 26649 (D.D.C. 2003) citing *Freeman v. Shultz*, 468 F2d 120, 123 -4 (D.C. Cir 1972).   The decision in *Keeley* noted the "well established" rule that where an initial complaint alleges discrimination and acts or reprisal against the agency, it is unnecessary to refile a new complaint for every new complaint citing *Bonds v. Heyman*, 950 F. Supp. 1202, 1208 (D.D.C. 1997).

Hence, the agency was clearly on notice of Plaintiff's specific claims of threats of retaliation and race claims, the claims were actually investigated and the parties had ample opportunity to pursue a resolution. Having put the agency on notice with respect to his retaliation and race claims, he is free to raise claims of retaliation as to follow on matters such as sick leave administration.

**B. BBG lacked Authority to Hire Aliens under 22 U.S.C. Section 1474(1) in VA 03 -29**

Defendant urges that its interpretation of Section 1474 of 22 U.S.C. so as to permit it to hire aliens when well qualified United States citizens are available is reasonable notwithstanding 25 years of administration of the provision in a manner consistent with Plaintiff's straightforward reading. Plaintiff has addressed these assertions regarding the authority of BBG to hire aliens under section 1474 in his Reply to Defendant's Opposition to Motion for Partial Summary Judgment.

**C. Plaintiff has satisfied the Requirements of a *Prima Facie* Case**

There is no dispute that Plaintiff is an Asian American of Burmese descent over the age of 58; that he applied for two positions at BBG in 2003; that he was found to be eligible for those positions; that he was referred to the selecting official as eligible for selection for each vacancy; and that when BBG filled the positions, he was not selected. He satisfies the "not onerous" requirements of a *prima facie* case. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Defendant recognizes that Plaintiff can meet the first two prongs of the *prima facie* case [national origin/ race and adverse action by non-selection for the positions] but urges that plaintiff cannot establish the third prong that requires that the action gives rise to an inference of discrimination. Defendant's Memorandum at 22. This proposition is entirely unpersuasive for the reasons set out below.

10

### 1. Direct Proof of Discrimination

The bulk of the case law dealing with the burdens of proof in discrimination claims addresses the analytic framework for inferences of discrimination where direct proof is lacking. Although, as discussed below, this case satisfies the *prima facie* requirements under those standards, there is direct proof of discrimination that obviates resort to the more refined analytical approaches.

The direct proofs take three forms. First, a *specific threat of retaliation* by the selecting official, Mr. Htay, communicated to Plaintiff and other applicants during meeting on June 13, 2003, the very time when Mr. Htay made the selections in which Mr. Htay, told Plaintiff and other employees that they should not complain about the selections for these two vacancies on pain of being blackballed and that they might find that even waiter jobs are scarce for them. Affidavit of K Nyunt at para. 3,4.

Second, there are direct statements by the selecting official and the former Burmese section chiefs that *a youth movement was part of office policy*. "Mr. Lwin is a star on the rise" according to former Burmese section chief Dan Robinson who tried to recruit Mr. Htun some years before and who arranged for Mr. Htun to meet Mr. Henderson in February 2003. See Plaintiff's Statements of Material Facts as to Which There are Genuine Issues ("PSF"), filed herewith, at para. 41 -44. Mr. Robinson declared that because of concern about loss of audience share the Burmese service had a policy of "recruit[ing] younger broadcasters" in an attempt to appeal to a diverse audience. *Id.*  Mr. Win, a former

Burmese service senior editor, also noted that Mr. Htun was known as a "rising talent" whom Mr. Robinson had targeted to recruit. The selecting official, Mr. Htay, too has declared his intent to recruit younger broadcasters to get more energetic voices on the air. Mr. Htun was 38 years of age in March 2003.

Third, BBG simultaneously created, approved, announced, and filled the two broadcaster positions and tailored both vacancies with care *making it clear that in one vacancy only an outside applicant would qualify.* Mr. Henderson, the Division Director, and the personnel specialist corresponded about the "inside" position, which became VA 03 - 26, and "outside" position, which became VA 29. The process of tailoring of the VA and crediting plan was part of the preselection process for a young candidate, Mr. Htun, in VA 03 - 29. The selection in the first vacancy was an attempt to inoculate or safeguard the second selection from criticism. It was well known that Mr. Htun had been recruited before and had been introduced to Mr. Henderson at the initiative of former Burmese service chief Dan Robinson  in early 2003. The former Burmese service senior editor, Mr. Win, stated that "[t]he fact that there were two separate announcements for GS - 12 openings is also puzzling to me. It clearly leads me to conclude that Mr. Htay or the Division determined ahead of time that there would be one job given to an applicant from inside the Service and the other from an outside candidate." Attachments at 157. There never was another occasion in recent years when two GS 12 broadcaster positions were posted in this service.   PSF at para. 80; Attachments at 49 *et seq.*


**2. The Facts Fully Satisfy the Requirements for an Inference of Discrimination**

A host of irregularities took place in the selections right from the beginning. Plaintiff's Statements of Material Fact as to which There are Genuine Issues sets them out in detail but they are summarized below.

### VA 26 Irregularities

• Mr. Myint, the selectee, was rated lowest candidate by rating panels for both positions. Mr. Myint was well known to have very poor voicing skills and English by his colleagues and former supervisors. Three affiants, including one who had rated the performances of Mr. Myint and Mr. Nyunt as part of his job as senior editor, declared that Mr. Nyunt was clearly more qualified. PSF at para. 58 -60.

• *Plaintiff Nyunt's rating was misrepresented on the certificate to the selecting official.* The rating panel awarded him a 96 but the certificate to the selecting official showed his ranking as 89, downgrading his ranking to the same level as that of Mr. Myint. PSF at para. 48 – 50.

• The personnel office for some unexplained purpose amended the vacancy file to "correct" Mr. Nyunt's score in October 2003 long after the selection had been made without notice to Mr. Nyunt. PSF at para. 50.

• Mr. Htay disregarded his assurances to the Burmese staff that he would delegate selection to a selection panel made up of language chiefs. Mr. Htay prepared the interview questions for the selection panel and sat on the panel. PSF at para. 53.

• The selection panel was not given the VOA standard instructions for panels on interviews, as required, and the members asked questions of their own. PSF at para. 55.

• Mr. Myint was not on the initial promotion certificate dated May 1, 2003 to Mr. Htay which expired on June 2; in fact, Mr. Myint was not ranked within the top three candidates which is the usual field for selection under the Rule of Three; and the selection was made on or after June 16. PSF 60, 61.

**VA 03 - 29 Irregularities**

• Crediting plans ("CP"), which are used to rank applicants, are required to track the duties of the position. The CP prepared by Mr. Henderson did not match the PD or the job title by, for example, not considering voicing and crediting matters not in the PD (e.g., developing plans and supervision of a team of five). PSF 64 - 68;

• Mr. Htun's application, received on March 31, 2003, was accepted and evaluated with the first batch of applicants after passage of first application deadline set in the VA at March 27, 2003; PSF 71- 74;

• *Under the terms of  VA 03 -29( "[f]irst cutoff will be 3/27/03" and "[s]ubsequent cutoffs every two weeks until the position is filled")  and the personnel procedures, Plaintiff Nyunt's application, filed on March 27, 2003 should have been evaluated in the first tranche without competition from applicants in later periods like Mr. Htun.  PSF at para. 69 -74.*

• Mr. Htay's justification of selection of Mr. Htun is geared to the inaccurate CP, which omitted voicing and included administrative duties not in the position. PSF at para. 76, 78.

• Mr. Htay noted in a memorandum of September 2003 that the agency has been trying to recruit Mr. Htun for more than six months – meaning since before the date the job was advertised in March 2003. PSF at para. 83.

• Mr. Robinson, who admitted to seeking young announcers, recommended Mr. Htun to Mr. Htay and termed him a "star on the rise." PSF at para. 41- 44;

• No interview or selection panel was used in VA 03 -26 as was in VA 26 even though Mr. Htay had assured the staff that interviews would be used on each vacancy. PSF at para. 77, 83;

• *Nothing about voicing was measured in the CP or the justification of the selection even though the position title was an international radio broadcaster with a primary duty of the job was radio announcing.* PSF at para. 76 -78.

• BBG policy and practice for IRB's and IB's applying for GS- 12 announcer positions is to measure voicing skills. PSF at para. 80.

• *Selection for this senior level radio broadcaster position was made by Mr. Htay without any interview and, indeed, without ever meeting the candidate he selected – his justification notes that he "do[es] not know" Lwin Htun.* PSF at para. 76 - 78.

**The Crafting of the VA's, PD's and CP's for Both Positions**

• Meeting of Mr. Htun with Mr. Dan Robinson, former Burmese service chief who was seeking younger announcers, in approximately February 2003 which prompted Mr. Robinson to arrange a meeting between Mr. Htun and Division Chief Henderson.  PSF 13-15.

•  Personal involvement of Mr. Henderson in February and March 2003 to revise the vacancy announcements ("VA"), position descriptions ("PD") and the crediting plans ("CP") for VA 03 -26 and 03 - 29 to the exclusion of the service chief, Mr. Htay who normally would prepare the documents. PSF at para. 16 – 21, 62.

• Structuring by Mr. Henderson of VA 03 - 29 to highlight areas in common with Mr. Htun's experience and education: web pages; journalism related training independent operation; and to deemphasize voicing in which Mr. Htun lacked substantial experience. PSF at para. 8 -21.

•   Advance designation by Mr. Henderson of "inside" and "outside" positions, VA 03 -26 and VA 03 -29, respectively, on  draft VA's, PD's and CP's. PSF 17 - 21.

Events have born out the description of Mr. Htun as a "star on the rise." He was promoted by Mr. Henderson to the GS-13 Burmese service chief position in May 2005 just over one year after he came on board VOA. His promotion to supervisor was made notwithstanding the BBG policy against promoting non-

16

citizens to supervisory positions and notwithstanding his ineligibility for the security clearance normal for supervisors. PSF 88 -89.

From the foregoing it is clear that there is ample evidence that in filling these positions VOA ran roughshod over its rules and any semblance of good sense.

The test for entitlement to a trial has been simplified to a permissible inference of something "fishy." See *Salazar v. WMATA, supra* at 507. Fish abound in this environment.

## G. The Defendant's Claim of Legitimate Non-Discriminatory Reasons Are Very Much in Dispute

At this stage the basic inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251 -252. An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id*. at 248. An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. *Id*. at 249. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate.

The irregularities notes above are sufficient to create triable issues. Moreover, Defendant's argument omits contradictory evidence.

**1.  The Claim of Legitimate Non-Discriminatory Reasons is Contradicted**

As to VA 03 -26 Defendant asserts that Plaintiff cannot make a *prima facie* case of national origin or age discrimination because the selectee, Mr. Myint, was of the same national origin and older that Plaintiff and because the selection panel members claim that Mr. Myint was found to be more qualified. The legal proposition that selection of a person from a plaintiff's protected group is fatal to a claim is erroneous as set out in the discussion above. See *Chappel-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006).

First, as Plaintiff has noted above, there were conspicuous irregularities in the selection process, most notably that the agency misrepresented his score in the certificate to the selecting official and inserted a correction months after the action had been taken. Defendant has not and cannot provide any legitimate non-discriminatory basis for that action.

Second, the claim that Mr. Myint was better qualified is specifically contradicted by Plaintiff, Mr. Hla, and Mr. Aung and by Mr. Win, the former supervisory editor for the Burmese service who worked for the service for over 35 years and supervised and rated Mr. Myint. Mr. Win declares that:

> However, Mr. Myint has problems with voicing and interviewing in English. He does not speak clearly. Also his understanding of the English language is not as strong as almost all the other VOA candidates. … Mr. Nyunt has excellent voicing skills… Mr. Nyunt has better communication skills and is clearly a much stronger candidate for that position than Mr. Myint…. Selecting Mr. Myint over Mr. Nyunt was a surprise to me and can only say that some favoritism was shown in the selection process.

Attachments at 157. The rating panels on both vacancies found Mr. Nyunt to be better qualified. The differences in the question of qualifications must be resolved by the trier of fact.

As to VA 03 -29, Defendant likewise seeks summary judgment claiming that Plaintiff cannot make a *prima facie* case of national origin discrimination because the selectee was of the same national origin. Further, Defendant acknowledges that Plaintiff can establish a *prima facie* case of age discrimination but urges that the clear superiority of Mr. Htun constitutes a legitimate non-discriminatory reason for the action.

Again, Plaintiff has demonstrated above serious irregularities in the selection process in VA 03 -29. Most conspicuously, Defendant is rationalizing a selection of a senior radio announcer *without the selecting official ever interviewing him and without his voicing skills ever being assessed.* Indeed, the crediting plan crafted by Mr. Henderson does not include voicing as a factor – this from an entity that claims to want to find younger, more energetic voices. Consideration of voicing in the selection of announcers was standard practice at the agency and for very obvious reasons. PSF at para. 80. The deliberate omission of voicing in the selection of an announcer as a factor in the vacancy announcement and crediting plan constituted departure from agency practice and standards in filling vacancies.[2] The standard template provided to selecting

---

[2] Every other GS 12 VA for IRB's or IB's from the East Asian Division from January 2003 to to January 2006 open to outside applicants included voicing experience as one of the five ksa's. VA 3-16 ("Ability to broadcast live and pre-recorded material in Mandarin."); VA 3-22A ( "Demonstrated skill in voicing materials for radio broadcast."); VA 4-25 ("Ability to broadcast live and pre-recorded material in Mandarin."); VA 4-32 (" Demonstrated ability to voice material for or during radio and or television broadcasts."); VA 4-43 ("Ability to broadcast live and pre-recorded material in Mandarin."); VA 5-88 (" Skill in radio reporting or videography that enables the incumbent to voice, digitally edit and prepare audio…"); VA 5-10 ("Ability to broadcast live and pre-recorded material in Mandarin."); VA-5-127 ("Demonstrated skills in announcing to present and voice effectively material broadcast by VOA Tibetan

officials for justifying the selection of an announcer includes as one of the main topics the measures of the voicing skills of the selectee. See Attachments at 152. Mr. Htay's justification omits any discussion of voicing because he never spoke to Mr. Htun before made his decision.

Defendant acknowledges that the position in VA 03 -29 included voicing duties as primary responsibilities but it does not address how voicing skills were measured in the selection process or on the crediting plan. Defendant's Memorandum at 39.

VA 03 -29 provided in the opening page that the position would be open until filled and "[f]irst cutoff will be 3/27/03" and "[s]ubsequent cutoffs until the position is filled." Mr. Nyunt's application was received on March 27, 2003. Mr. Htun's application was received on March 31, 2003, after the initial cut off date in VA 29 of March 27, 2003. PSF at para. 70, 71. Mr. Htun's application should not have been forwarded to the selecting official with the first cutoff of applications but with the second batch of applications in the event that no selection was made on the first certificate because the announcement established a priority for earlier batches of applications. The BBG staffing specialist that handled the announcements, Ms. Fitzpatrick, confirmed the plain meaning. PSF at 71, 72. Defendant's argument that no rule of law or manual would prevent the agency from considering applications from the cutoffs at the same time is nothing more than argument that the explicit terms of the VA were not biding on the agency. A departure from the terms of the VA is an irregularity as to which Plaintiff is entitled to have weighed by the trier of fact in support of his claim of discrimination.

---

Service…");  VA 5-201 ("Demonstrated ability …[to] conduct interviews in Mandarin for radio or TV and to translate and voice materials in Mandarin."). See Attachments at 49 *et seq*.

The ksa's and the crediting plan were artificially skewed to add administrative skills ("managing a budget for a professional organization") and to remove voicing to match Mr. Htun's qualifications for duties not in the position description for VA 03 -29. PSF at 22, 23.

Finally, in the years since 2003, the Burmese service has been pressuring older Burmese Asian employees, most of whom are citizens, to leave so they can be replaced with younger employees and contractors, most of whom are aliens. Five announcers over the age of 58 have left the federal service. Two announcers over 40 transferred to other positions out of the service. Of the six regular GS employees brought in since then, all but one were under 40. See Attachments at pg 169 for the names and ages of these individuals. In addition, a number of contract employees, at least 5, were bought in, all of whom are under 30 years of age. See Affidavit of K Nyunt at para. 22.

## IV.    Conclusion

Defendant' Motion must fail because it ignores conspicuous irregularities in filling of the vacancies set out above and it is reliant on facts that are contradicted.

The propositions set out in the affidavit of the BBG personnel officer, Ms. Murphy, do nothing to advance that claim for summary judgment. Her claim that Mr. Nyunt was unharmed by the "fact that his score was mistakenly recorded" on the certificate to the selecting official, Exhibit U to Defendant's Motion at pg. 3, in VA 03 -26 is speculative and not based on any personal knowledge.  In any

event the claim is contravened by Plaintiff's assertion that it was part of the effort to avoid selecting him.

Ms. Murphy asserts that procedures do not require that standard instructions be given to interview panelists. Exhibit U to Defendant's Motion at pg. 3 BBG guidelines for conducting interviews provide that "Selecting officials are encouraged to use interview panels" and panels should be given "as part of their instructions … [t]hese guidelines, Guidance for Conducting Effective Interviews and Reference Checks, and Illegal and Legal Interview Subjects." See Attachments at 19. The staffing specialist that handled the vacancies stated in her deposition, " [w]e advise [managers] to interview." See also Fitzpatrick Deposition, Attachments at  129. Those 14 pages of pamphlets are intended to be provided to panels. See Attachments at 19 – 33.

Ms. Murphy asserts that "nothing in the Agency's Manual of Administration or the Code of Federal Regulations" prevented Mr. Nyunt's and Mr. Htun's applications from being considered at the same time. Exhibit U to Defendant's Motion at pg. 3. Violations of GGB manuals or the CFR are not the only paths to discrimination, of course. Ms. Fitzpatrick, the staffing specialist who handled the announcements, specifically confirmed that the announcements provided a priority for earlier tranches of applicants. See PSF at para. 71 -73.

Selection of an alien for VA 03 -29 when Plaintiff, a suitably qualified United States citizen, was available was unlawful under 22 U.S.C. section 1474.


For the foregoing reasons, Plaintiff has triable issues of discrimination

with respect to national origin, age, and race in VA 03 -26 and VA 03 – 29 as well as retaliation. A Statement of Material Facts as to Which There are Genuine Issues, together with a collection of supporting documents and declarations, an index of the documents, and an affidavit of Plaintiff Nyunt, and a proposed order are submitted herewith

Respectfully submitted,


Timothy B. Shea
Nemirow, Hu & Shea
1629 K Street, NW #500
Washington, DC  20006
Tel. 202 835 0300
Fax 202 835 0306

Dated: May 7, 2007