

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# WASHINGTON REGIONAL OFFICE

MOE MOE HTUN,

    Appellant,

    v.

BROADCASTING BOARD OF
GOVERNORS,

    Agency.

DOCKET NUMBER
DC-1221-07-0466-W-2

DATE: January 7, 2008

R. Douglas Taylor, Jr., Esquire, Bethesda, Maryland, for the appellant.

April Bennett Cabral, Esquire, Washington, for the agency.

### BEFORE
Thomas P. Cook
Administrative Judge

### INITIAL DECISION

The appellant initially filed this individual right of action (IRA) appeal pursuant to the Whistleblower Protection Act on March 1, 2007. The administrative judge dismissed the appeal without prejudice to refiling. The appellant timely refiled it, and the Board designated the undersigned administrative judge to adjudicate the appeal. The Board has jurisdiction over the appeal. 5 U.S.C. §§ 1221(a), 2302(a)(2); 5 C.F.R. § 1209.2. For the reasons explained below, the appellant's request for corrective action is GRANTED.

## ANALYSIS AND FINDINGS

Background

The parties have stipulated to many facts material to the appeal. With a few additions I find supported by the record evidence and/or are undisputed, the facts detailed in this background discussion are based on the parties' stipulations included in their joint prehearing statement or their stipulations at the prehearing conference. From October 2000 until April 2001, the agency employed Appellant as a contract employee. However, from April 2001 until the present, the agency has employed the appellant in the federal civil service. She worked in the position of International Radio Broadcaster for the Burmese Service of the Voice of America until October 2006, and has worked since then in the agency's Central News Division, English Web Desk, as an International News Specialist, Internet. The agency employed the appellant at the GS-9 level until April 2002 when she became a GS-11, which she remains today.

In February 2004, the agency hired Than Lwin Htun (TLH) as GS-12 International Broadcaster (Burmese) in the Burmese Service. TLH was not a United States citizen when the agency hired him in February 2004. The agency selected TLH in May 2005 for the position of Service Chief of the Burmese Service. TLH was not a United States citizen when the agency selected him for the Burmese Service Chief position. The Burmese Service Chief is a supervisory position, and TLH became the appellant's first-line supervisor. TLH's first-line supervisor in the Service Chief position was and is Jay Henderson, Director, East Asia and Pacific Division, Voice of America. Henderson selected TLH for the position.

On July 7, 2005, appellant made various disclosures regarding the agency's hiring of TLH and TLH's background in a letter submitted by Tim Shamble, President of Local 1812, American Federation of Government Employees. The letter was sent to: Howard Krongard, Inspector General of the Department of State; Kenneth Y. Tomlinson, Chairman of the Broadcasting Board of Governors;

Janice Brambilla, Chief of Staff of the International Broadcasting Bureau; David Jackson, Director of the Voice Of America; and Linda Springer, Director of the Office of Personnel Management. Also, on July 11, 2005, the appellant made similar disclosures in a letter sent to Michael Chertoff, Secretary of the Department of Homeland Security; the Chertoff letter was signed by the appellant, Aung Hla and Kyaw Zaw Nyunt, and included the allegation that the agency had illegally hired TLH, a non-citizen. Further, the appellant allegedly made disclosures about the agency and TLH in a December 16, 2005, e-mail to Richard Lowe, Deputy Director of the Office of Personnel Management.

In March 2006, the agency opened an investigation into the appellant's disclosures. The agency finalized its report of investigation into the alleged disclosures on April 4, 2006. On April 11, 2006, TLH made a request to the agency under the Freedom of Information Act for a copy of his Security Office file, which included a narrative report of investigation and many documents. On April 28, 2006, the agency's FOIA Officer provided TLH with a copy of all documents in his Security Office file, except for the narrative report of investigation itself. The appellant's July 11, 2005, letter to Secretary Chertoff was one of the documents the agency provided to TLH on April 28. On May 3, 2006, the agency provided TLH with a copy of its April 4, 2006, narrative report of investigation.

Jay Henderson met with a group of employees of the Burmese Service, including the appellant, on April 12, 2006. Henderson testified he prepared the written text with the help of his labor relations department and he read it to the Burmese Service employees, including the appellant.[1] Appeal File (AF1), MSPB Docket No. DC-1221-07-0446-W-1, Tab 13, Subtab 4i; AF2, MSPB Docket No. DC-1221-07-0446-W-2, Tab 39, Appellant's Exhibit SS; Hearing Testimony

---

[1] Henderson further testified that "all of the content" in the written text "reflects his thinking." HT, Henderson.

(HT), Henderson. He testified he did this because there had been a "series of allegations against figures of authority in the agency" that had reached a "crescendo" with the most recent complaints, and he wanted to "stop the allegations." HT, Henderson. The text of Henderson's speech is significant and is set forth in full here:

> I think many of you know that AFGE submitted a letter to the Office of Security that included accusations from an anonymous source that questioned U Than Lwin Htun's background and character. Some of you may have been contacted and provided statements in regard to this investigation.
>
> As it always does with serious allegations, the Office of Security thoroughly investigated the charges. Today I want to tell you that the investigation resulted in a *complete exoneration* of Mr. Htun.
>
> I would add that I always knew this would be the case as I have a high regard for Mr. Htun's personal integrity. *I even believe those who made the accusations also knew the investigation would turn out this way.*
>
> *What could motivate sonmeone* [sic] *to do such a thing?* Unfortunately for everyone in the Service, the world thinks no better of VOA Burmese because of this incident. *I fear these groundless charges will only cause the world to look down on our Service more than ever before.*
>
> My task now - and I invite you to join me in facing this task head on - is to try to turn things around by ensuring that everyone in this Service, in this Division, in VOA, and in the Burmese community is aware that *the charges made against Mr. Htun were completely groundless. If you know who is doing this, please ask them to stop now.*
>
> *This investigation worried me in another way. I believe one or more VOA Burmese staff members were responsible for making these charges.* Whether you were or not, *I want to remind everyone* that VOA's agreement with the Union clearly says *it is inappropriate for an employee to make false or malicious accusations against a supervisor or a coworker. So listen closely: you need to consider your actions carefully before you attempt to undermine your supervisor, or a coworker for that matter, through false and malicious statements. I will not tolerate it and this agency will not tolerate it. If you were involved in this complaint - or any of the*

*complaints against several VOA Burmese Chiefs before U Than Lwin Htun (all of which turned up empty) - now is the time to put away your grievances and rejoin those of us who are here to accomplish something positive for the people of Burma.*

*Although it pains me to do so, I am willing to accept - accept, not believe – that whoever leveled these charges against Mr. Htun did so this time out of genuine concern. However, we now know that **ALL** of these accusations are false. Therefore, anyone repeating the charges will knowingly be making a false and malicious statement and will be subject to disciplinary action.* According to the AFGE contract, VOA is empowered to discipline any employee who makes false, malicious, or unfounded statements. *The minimum penalty is a reprimand. But I also have the power to remove someone from the federal service for even one offense.*

Let me end by saying that I understand that some of you may not like Mr. Htun, you may not like me, and you may not even like working for this agency. I am not asking you to like it. My only concern, and the only thing that Mr. Htun has ever asked of anyone who works for this Service, is that you *do your job and conduct yourselves professionally while in the workplace. That means respecting your supervisor and your coworkers and doing your work. If that is more than you wish to do, you should be pursuing the early retirement and buyout opportunities available to you. Mr. Htun has my full support and the full support of VOA management. I expect him to be here as Chief of the Burmese Service for a very long time to come.*

AF1, Tab 13, Subtab 4i; AF2, Tab 39, Appellant's Exhibit SS (italics added; bold in original); HT, Henderson.

On April 7, 2006, the agency published vacancy announcement number M/P 06-63 for the purpose of filling the position of GS-12 International Broadcaster (Burmese), in the Burmese Service. The agency filled two GS-12 vacancies under vacancy announcement M/P 06-63. TLH was the selecting official for both selections that were made under M/P 06-63. The appellant submitted her application under both internal merit promotion procedures and external competitive procedures. She was a United States citizen at the time she submitted her application and at all times relevant to this appeal. TLH did not select the appellant for either vacancy.

TLH selected Thein Htike Oo to fill the first GS-12 vacancy under M/P 06-63 on May 30, 2006. On June 6, 2006, Than Lwin Htun conducted interviews of the appellant and other qualified applicants for the second vacancy under M/P 06-63. TLH selected Khin Soe Win to fill the second GS-12 vacancy under M/P 06-63 on August 21, 2006. TLH knew about Appellant's July 11, 2005 alleged disclosures at the time he did not select her for both GS-12 vacancies under M/P 06-63.

TLH was the rating official for the appellant's performance evaluation covering the time period from May 1, 2005 through April 30, 2006. Although TLH rated the appellant acceptable and made some positive comments in the performance evaluation he signed July 19, 2006, he also made narrative comments that were clearly derogatory:

> Area for Improvement: I commend Ms. Htun for being very willing to help or assist other team members. However, she sometimes makes strong comments and criticisms to her coworkers or takes an uncompromising stance, which tends to fracture teamwork. She had a few intense arguments with coworkers during the rating period that led to verbal counseling. Positive teamwork is one of the most important factors in any employee's ability to excel as a broadcaster. I am certain that Ms. Htun will be able to improve her teamwork abilities during the current rating period, which, in turn, will enhance the work in the Service.

AF2, Tab 39, Appellant's Exhibit MM at 14.

On October 26, 2006, the appellant filed a complaint with the Office of Special Counsel ("OSC") alleging that TLH had retaliated against her because of disclosures she made against him and the agency. By letter dated December 12, 2006, OSC informed the appellant it was closing its inquiry into her whistleblower complaint, and in a letter of December 27, 2006, OSC notified appellant of her right to seek corrective action from the Board. Appellant filed the subject appeal with the Board on March 1, 2007.

At the prehearing conference, I identified the following to be the material issues to be decided in the appeal, to the exclusion of all other issues: (1)

Whether the appellant established by preponderant evidence that she engaged in protected whistleblowing activity on July 7, 2005, when Tim Shamble, President, AFGE Local 1812, sent a letter alleging that the appointment of TLH as Burmese Service Chief was illegal, to the Inspector General of the U.S. Department of State with copies to Kenneth Tomlinson, Chairman of the Broadcasting Board of Governors, Janice Brambilla, Chief of Staff, International Broadcasting Bureau, David Jackson, Director, Voice of America, and Linda Springer, Director, Office of Personnel Management; (2) whether the appellant established by preponderant evidence that she engaged in protected whistleblowing activity on July 11, 2005, when she and two other employees sent a similar letter to Michael Chertoff, Secretary of Homeland Security; (3) whether the appellant established by preponderant evidence that she engaged in protected whistleblowing activity on December 16, 2005, when she sent an email to Richard Lowe, Deputy Chief of Staff, Office of Personnel Management, regarding TLH; (4) whether the appellant established by preponderant evidence that protected whistleblowing was a contributing factor in a covered personnel action, i.e., an agency threat to take a disciplinary action during a meeting held on April 12, 2006; a performance appraisal on July 14, 2006,[2] that included unfair comments; the agency's decision to select another candidate and not the appellant to a GS-12 position on May 30, 2006; and the agency's decision to select another candidate and not select the appellant to a GS-12 position on August 21, 2006; and (5) whether the agency has established by clear and convincing evidence that it would have threatened, failed to take or taken the alleged personnel actions in the absence of any protected whistleblowing activity. Neither party objected to my statement of the material issues, although I provided them an opportunity to do so after receiving my prehearing conference summary and order. At the conclusion of the prehearing

---

[2] TLH and the appellant actually signed the written performance evaluation on July *19*, 2006.

conference, I ordered the appellant to submit a written statement identifying each alleged protected disclosure and the law, rule or regulation allegedly violated as an aid to narrow the contested issues. AF2, Tab 40 at 6. She timely complied with my order. AF2, Tab 42.

I held the appellant's requested hearing on December 19 and 20, 2007, at the Board's Washington Regional Office in Alexandria, Virginia. I heard the testimony of 9 witnesses including the appellant. Both parties made brief closing statements at the conclusion of the hearing on December 20.

## The appellant established the Board's jurisdiction over her IRA appeal.

The Board may have jurisdiction in an IRA appeal over a claim that a personnel action was taken, proposed, threatened, or not taken because of an individual's whistleblowing activities. An appellant has the burden of proving that the Board has jurisdiction over her IRA appeal. In order to prove that the Board has jurisdiction over an IRA appeal, the appellant must show that she has exhausted her administrative remedies before the OSC and make nonfrivolous allegations that: (1) She engaged in whistleblowing activity by making a protected disclosure under 5 U.S.C. § 2302(b)(8), i.e., she disclosed information that she reasonably believed evidenced a violation of law, rule or regulation, gross mismanagement, a gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety; and (2) the disclosure was a contributing factor in the agency's decision to take, threaten or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). *See Rusin v. Department of the Treasury*, 92 M.S.P.R. 298, ¶ 12 (2002), *citing, Yunus v. Department of Veterans Affairs*, 242 F.3d 1367 (Fed.Cir.2001). The Board only has jurisdiction over those personnel actions and disclosures that have been raised with OSC.

Based on the parties' stipulations and other record evidence, I concluded the appellant had exhausted her remedies at OSC and had made a nonfrivolous allegation that she disclosed wrongdoing identified in the WPA, i.e., violations of

federal laws or agency regulations or rules when the agency hired TLH, a non-citizen. I also found she had made nonfrivolous allegations that her protected whistleblowing disclosures were a contributing factor in the agency's failure to select her for the two GS-12 positions. I therefore determined that the Board has jurisdiction over the appellant's IRA. *Id.* at 4.

## An IRA appeal involves shifting burdens of proof.

Once an appellant establishes Board jurisdiction over an IRA, she then must prove by *preponderant evidence*: (1) She made a protected whistleblowing disclosure; and (2) a protected disclosure was a contributing factor in the agency's personnel action. If she meets this burden, the agency must establish by clear and convincing evidence that it would have taken the same personnel actions in the absence of the disclosures. *Horton v. Department of the Navy*, 66 F.3d 279, 284 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 1176 (1996). A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(c)(2). "Clear and convincing evidence" is that "measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(d). It is a higher standard than "preponderance of the evidence." *Id.*

## The appellant established by a preponderant of the evidence that she made a protected whistleblowing disclosure.

The appellant must establish by preponderant evidence that she disclosed what she reasonably believed evidenced a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or substantial and specific danger to public health or safety. The appellant need not prove that the situation actually existed, only that a reasonable person in her position would believe that it did. Also, she must have disclosed the situation to persons who may be in a position to act to remedy it, either directly by

management authority, or indirectly as in a disclosure to the press. *See Schaeffer v. Department of the Navy,* 86 M.S.P.R. 606, 612 (2000), *citing, Horton v. Department of the Navy,* 66 F.3d 279 282 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1176, (1996). A "reasonable belief" exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the government evidence wrongdoing as defined by the WPA. *See LaChance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1153 (2000); *McCorcle v. Department of Agriculture*, 98 M.S.P.R. 363, ¶ 19 (2005).

The appellant alleges she disclosed violations of law, rule or regulation; gross mismanagement; and abuse of authority. Although the WPA does not define "rule," the Board has suggested it includes established or authoritative standards for conduct or behavior. *See Rusin,* 92 M.S.P.R. 298, ¶¶ 15-20. Gross mismanagement means a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. A disclosure questioning management decisions that are merely debatable or just simple negligence or wrongdoing, with no element of blatancy, is not protected as a disclosure of gross mismanagement. *See Czarkowski v. Department of the Navy*, 87 M.S.P.R. 107, ¶ 12 (2000); *White v. Department of the Air Force*, 63 M.S.P.R. 90, 95 (1994). An abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or results in personal gain or advantage to himself or to other preferred persons. *McCorcle*, 98 M.S.P.R. 363, ¶ 24; *Wheeler v. Department of Veterans Affairs*, 88 M.S.P.R. 236, ¶ 13 (2001).

The appellant alleges she disclosed in the July 7 union letter and her signed July 11 letter what she reasonably believed to be violations of the United States Information and Educational Exchange Act of 1948 ("USIEEA"), 22 U.S.C. § 1474, and sections 820-823 of the agency's Manual of Operation and

Administration (MOA). AF2, Tab 42. She alleges she disclosed and reasonably believed that the agency violated these provisions when it hired TLH, a non-citizen, for the position of Burmese Service Chief, even though "suitably qualified," or "equally or better qualified" U.S. citizen applicants were available. *Id.* The appellant further alleges she disclosed and reasonably believed the agency had violated the Voice of America (VOA) charter (Public Law 94-350) by permitting TLH "to repeatedly air VOA news broadcasts that failed to report the news accurately, objectively and comprehensively" and that failed to present the United States policy toward Burma "clearly and effectively." *Id.*

The parties do not dispute the appellant alleged in her disclosures that the agency violated federal laws and/or the agency's own rules or regulations when it hired TLH for the position of Burmese Service Chief although he was not a United States citizen. The parties also do not dispute that TLH is not a United States citizen. The agency, however, belatedly argues that the appellant's alleged disclosures regarding its hiring of non-citizens cannot be considered protected whistleblowing disclosures because the agency's practice of hiring non-citizens was publicly known[3]. In this regard, the Federal Circuit has held that a disclosure of information that is "publicly known" is not a protected disclosure under the WPA. *See Meuwissen v. Department of the Interior*, 234 F.3d 9, 13 (Fed. Cir. 2000). The Board, however, has narrowly construed the Meuwissen decision, noting the Federal Circuit emphasized that "the policy of excluding illegitimate children from ... heirship determinations was publicly known, having been disclosed in [published] decisions." *See Askew v. Department of the Army*, 88 M.S.P.R. 674, ¶ 21 (2001) (emphasis added). The *Askew* Board also declined to give a broad reading to selected passages in *Meuwissen* because the legislative

---

[3] The agency did not mention the "publicly known" issue prior to or during the prehearing conference. However, given that this specific point arguably relates to the more general issue of whether the appellant made a protected disclosure, I allowed evidence on the issue and I will address it in deciding the merits of the appeal.

history did not support the proposition that a matter "not concealed" or "already known" cannot be the subject of a protected disclosure. Id., ¶¶ 22, 23. The Board more recently affirmed the principles of *Askew* in *Simone v. Department of the Treasury*, 105 M.S.P.R. 120, ¶ 7 (2007), finding that an agency's internal alert notification was not comparable to the official publications that were at issue in Meuwissen.

Although there are references in the record to other complaints about the hiring of non-citizens, the agency failed to present credible evidence that its general policy of hiring non-citizens had been questioned as a violation of 22 U.S.C. § 1474 or the agency's MOA in any official publication similar to *Meuwissen*.[4] Furthermore, other than the appellant's alleged whistleblowing disclosures at issue in the appeal, the agency did not present evidence of any "public" disclosure that TLH, a non-citizen, had been illegally hired as Burmese Service Chief. Accordingly, in accordance with Askew and Simone, I find the appellant's alleged whistleblowing disclosures do not fall outside the protection of the WPA merely because she may not have been the first person to raise the general "non-citizen" hiring issue or allege that TLH's hiring was illegal. In any event, I also find based on the evidence in this record that the appellant and her fellow employees were the first to "disclose" the agency may have committed wrongdoing by hiring non-citizen TLH for the position of Burmese Service Chief. Meuwissen thus does not defeat the appellant's allegations that she made a protected whistleblowing disclosure.

In the USIEEA, Congress has authorized the agency to:

---

[4] The TLH's Security File shows that the agency's general counsel responded to an inquiry from its Inspector General regarding the alleged illegality of hiring TLH, a non-citizen. AF2, Tab 39, Appellant's Exhibit J. The record also reflects the appellant's union filed an institutional grievance dated June 7, 2006, with the agency regarding the agency's hiring on non-citizens. AF2, Tab 39, Appellant's Exhibit A. Neither is the type of "public disclosure" that occurred in *Meuwissen*.

> *employ*, without regard to the civil service and classification laws, *aliens* within the United States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs *when suitably qualified United States citizens are not available* when job vacancies occur.

22 U.S.C. § 1474(1) (emphasis added). It is undisputed that Congress has not specifically defined "suitably qualified," but the agency has attempted to define it in section 820 of its MOA entitled "Employing Non-U.S. Citizens For Duty In The United States." [5] AF2, Tab 39, Appellant's Exhibit GG.

Rather than making a relatively objective determination whether a citizen applicant for a position is "suitably qualified" based on the requirements of the position and the applicant's qualifications, the agency broadly interprets USIEEA as allowing it to hire a non-citizen "if no equally or better qualified U.S. citizen is available to perform the duties of the position." *Id.*, MOA § 822.1. The hiring process thus becomes an exercise of weighing the relative qualifications of citizen and non-citizen candidates, resulting in the hiring of a non-citizen if the agency determines he or she is "better qualified" than any citizen applicant.[6] HT, Susan King. The agency's MOA, though, further restricts its stated authority to hire non-citizens to "supervisory positions or positions which involve policy or program decision-making," allowing such appointments "only on an individual basis when ... the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but is also is having

---

[5] Section 820 of the agency's MOA begins: " The following material prescribes [the agency's] policies, responsibilities, and procedures governing the employment in the Unites States of non-U.S. citizens ...." I therefore specifically find the agency's MOA is, at a minimum, a rule covered by the WPA. *See Rusin,* 92 M.S.P.R. 298, ¶¶ 15-20.

[6] The great effort the agency is willing to apply to justify the selection of a non-citizen over apparently qualified U.S. citizens is evident in the records of this appeal. AF2, Tab 39, Appellant's Exhibits S-BB; Tab 43, Appellant's Exhibit Z.

an adverse impact on Broadcasting's mission." AF2, Tab 39, Appellant's Exhibit GG at 3, MOA § 822.1c(1).

The appellant claims she reasonably believed that this selection process in general, and as specifically applied by the agency to its selection of TLH for Burmese Service Chief, violated the preference for U.S. citizens expressly required by 22 U.S.C. § 1474, and that the TLH appointment also violated the agency's MOA. AF2, Tab 42; HT, Appellant; AF1, Tab 2, Attachments to OSC Complaint, Exhibits 1, 2. Although the agency went to great pains to justify the selection of TLH, a non-citizen, the agency's records of the TLH selection show that two other qualified candidates were available, and both were U.S. citizens. AF1, Tab 13, Subtabs 4o-4q; AF2, Tab 39, Appellant's Exhibit AAA-DDD; HT, King.

The appellant does not have the burden to prove that TLH's appointment was actually unlawful. She need only establish by preponderant evidence that a disinterested observer could reasonable conclude that she disclosed wrongdoing as defined by the WPA, i.e., in this case that TLH's appointment was a violation of law, rule or regulation. After considering the entire record, I find she has done so. A reasonable reading of the statute limits the hiring of "aliens" more significantly than the agency does. The appellant relied on her personal knowledge of the available candidates for Burmese Service Chief, and her personal experience and the well-known history that the position had been previously filled by individuals who did not speak Burmese. HT, Robinson. The recent arbitration decision, although it did not address the specific matter of TLH's appointment and is not otherwise binding on the Board, certainly lends credibility to the appellant's argument that the agency violated the statute when it hired TLH for Burmese Service Chief. AF2, Tab 39, Appellant's Exhibit 1. The agency's statutory interpretation may ultimately prevail and the arbitrator's decision regarding the agency's policy for hiring non-citizens reversed. However, the appellant's position that the agency appointed TLH, a non-citizen,

in violation of 22 U.S.C. § 1474 and the agency's MOA was a reasonable one.[7]  I therefore find that the appellant has established by preponderant evidence that she made protected whistleblowing disclosures in the July 7, 2005, union letter and the July 11, 2005, letter to Secretary Chertoff.

I further find the appellant failed to prove that she reasonably believed she disclosed a violation of the VOA charter by alleging the agency permitted TLH "to repeatedly air VOA news broadcasts" that were inaccurate or failed to clearly present U.S. policy on Burma. The evidence on this issue is, at best, ambiguous. HT, TLH, Henderson, Appellant. The appellant alleges that on one occasion TLH provided a misleading report about religious intolerance in Burma, specifically claiming he either mistranslated or misrepresented the findings of a report on religious freedom. These arguments are susceptible to considerable subjectivity and differences of opinion, both in terms of translation of the report into Burmese and the considerable judgment exercised in summarizing such a report. Accordingly, I find the appellant failed to establish by a preponderance of the evidence that she reasonably believed TLH had violated of the VOA charter. Even if she had, she did not establish she reasonably believed the agency had repeatedly allowed TLH to broadcast inaccurate or misleading reports.

<u>The appellant established by preponderant evidence that a protected whistleblowing disclosure was a contributing factor in Henderson's April 2006 threat to discipline her and other employees, TLH's failure to select her for two GS-12 positions, and in TLH's negative performance evaluation.</u>
The appellant must also establish by a preponderance of the evidence that a protected disclosure was a contributing factor in an agency personnel action. An appellant may demonstrate that a disclosure was a contributing factor in a

---

[7] The appellant also alleged she disclosed "gross mismanagement" and "abuse of authority." AF2, Tab 40 at 5. Although she did not formally abandon these claims, she made no effort to prove them and did not assert them in her closing statement. In any event, I find the appellant failed to prove by preponderant evidence that she disclosed gross mismanagement or abuse of authority as recognized by the WPA and defined by the Board.

personnel action through circumstantial evidence, such as evidence that the official taking the personnel action knew of the disclosure, and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *See Scott v. Department of Justice*, 69 M.S.P.R. 211, 238 (1995), *aff'd*, 99 F.3d 1160 (Fed. Cir. 1996) (Table); 5 U.S.C. § 1221(e)(1)(A), (B)   A "personnel action" includes taking, failing to take or threatening to take an "appointment," a promotion, an adverse or other disciplinary action, and a performance evaluation. *See* 5 C.F.R. § 1209.4. To satisfy the "knowledge/timing" test, the appellant need only demonstrate that the fact of, not necessarily the content of, the protected disclosure was one of the factors that tended to affect the personnel action in any way. *See Rubendall v. Department of Health & Human Services*, 101 M.S.P.R. 599, ¶ 11 (2006).

Once the knowledge/timing test has been met, an administrative judge must find that the appellant has shown that her whistleblowing was a contributing factor in the personnel action at issue, even if after a complete analysis of the evidence a reasonable fact finder could not conclude that the appellant's whistleblowing was a contributing factor in the personnel action. *See Armstrong v. Department of Justice*, MSPB Docket No. PH-1221-06-0055-W-2 (November 30, 2007), ¶¶ 19, 23; *Rubendall*, 101 M.S.P.R. 599, ¶ 12; *Carey v. Department of Veterans Affairs*, 93 M.S.P.R. 676, ¶ 13 (2003). Consequently, when the knowledge/timing test has been met, it is unnecessary to consider additional evidence on the contributing factor issue. *See Armstrong v. Department of Justice*, ¶ 23.

The appellant clearly meets the knowledge/timing test for the personnel actions at issue here. I find that Henderson's speech to the Burmese Service was a threat to take a disciplinary action and thus a personnel action covered by the WPA. *See Campo v. Department of the Army*, 93 M.S.P.R. 1, ¶¶ 7, 8 (2002). In addition, the failure to select the appellant for the two GS-12 positions and the

July 2006 performance evaluation are also personnel actions covered by the WPA.

As I noted in the jurisdictional discussion above, the parties stipulated that TLH was aware of the appellant's disclosures to Secretary Chertoff when he made the selections for the two GS-12 positions and did not select the appellant, and when he issued the appellant's performance evaluation. Henderson testified that the agency's labor relations department had provided him copies of the July 7, 2005, union letter and the July 11, 2005, letter to Chertoff signed by the appellant and other coworkers. HT, Henderson. Henderson further testified that he went to the Director of the Office of Security, John Wybenga, specifically to discuss the allegations against TLH. *Id.* When Wybenga informed Henderson of the results of the investigation completed by the Office of Security, Henderson then prepared and gave his talk to the staff of the Burmese Service on April 12, 2006. HT, Wybenga, Henderson.

Considering the parties' stipulations and the additional evidence just discussed, I find that all the personnel actions at issue occurred within a period of time such that a reasonable person could conclude that a protected disclosure was a contributing factor in the personnel actions. Consequently, because the knowledge/timing test has been met, it is unnecessary to consider additional evidence regarding contributing factor. *See Armstrong v. Department of Justice*, ¶ 23. The appellant thus has met her burden on the contributing factor issue.

The agency failed to show by clear and convincing evidence that in the absence of the appellant's protected disclosures it would have threatened a disciplinary action on April 12, 2006; failed to select the appellant for the GS-12 position on May 30, 2006; and issued the negative comments in the appellant's performance evaluation issued on July 19, 2006.

In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of

whistleblowing, the Board generally will consider the following factors: (1) The strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *See Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). In weighing the agency's assertion that it would have taken the same personnel actions without regard to the appellant's disclosures, the Board must assess the evidence as it stood at the time of the agency's actions. *See Yunus*, 242 F.3d at 1372. However, when the personnel action is not disciplinary, the Board considers the broader question of whether the agency had legitimate reasons for its actions when addressing factor one (1) of the *Carr* decision. *See Azbill v. Department of Homeland Security*, 105 M.S.P.R. 363, ¶ 18 (2007); *Gonzalez v. Department of the Navy*, 101 M.S.P.R. 248, ¶ 12 (2006).

Henderson's April 12, 2006, speech to the Burmese Service

By its express language, there is no doubt that Henderson's speech to the Burmese Service on April 12, 2006, was a threat to discipline, even fire, any employee who would dare to complain about management officials of the agency. Henderson "was not involved in the [investigation] process" involving the complaints against TLH. HT, Henderson. He did not know how the Office of Security investigated the matter. *Id.* Yet the text of the speech he read to the employees of the Burmese Service expresses Henderson's personal belief that the investigation resulted in a "complete exoneration" of TLH, the accusations were "completely groundless"[8] and "false and malicious," and the employees who made the accusations did not have "genuine concern." *Id.* AF2, Tab 39,

---

[8] Security Chief Wybenga testified he did not use these descriptive words when talking to Henderson. Rather, he merely told Henderson that "the inquiry has been completed and we don't plan any further action," or similar words. HT, Wybenga.

Appellant's Exhibit SS.    Henderson essentially stated to employees of the Burmese Service that if they made any similar accusations against TLH or management he might "remove" them. *Id.* He unabashedly concluded his speech by telling employees who don't "like it" to pursue "early retirement or buyout opportunities." *Id.*

The question of whether Henderson would have threatened to discipline the appellant and other Burmese Service employees in the absence of the appellant's whistleblowing is not a close call. Henderson's main point in talking to Burmese Service employees was because he was upset by the complaints against TLH. HT, Henderson.    By his own account, he was "angry" when he made the statement. *Id.*; HT, Appellant. Complaints against "figures of authority" at the agency had reached a "crescendo" with the recent complaints against TLH. HT, Henderson. Further, Henderson had considerable motive to retaliate against the appellant and other employees signing the complaint letters. He had selected TLH for the position of Burmese Service Chief, and had written an extensive justification for hiring him although he is a non-citizen. In Henderson's own words: "[TLH] has my full support and the full support of VOA management. I expect him to be here as Chief of the Burmese Service for a very long time to come." The appellant's complaints were obviously an embarrassment to him, as he suggested that the "groundless charges will only cause the world to look down on our Service more than ever before." AF2, Tab 39, Appellant's Exhibit SS.

The agency and Henderson also had a lot to lose if the appellant's complaints about illegal hiring of non-citizens, including TLH, were sustained. Such complaints could jeopardize a significant basis for the agency's hiring decisions, and looming in the distance was the prospect that many employees, including TLH, could have illegal appointments. There is also no evidence that other employees under Henderson's supervision were threatened with disciplinary action even though they had not made disclosures similar to the appellant's. For all of theses reasons, I find the agency failed to prove by clear and convincing

evidence that Henderson would have threatened the appellant and other employees with discipline absent the protected whistleblowing activity.

### The July 14, 2006, performance evaluation

I also find the agency did not establish by clear and convincing evidence that TLH would have made the critical comments in the appellant's July 2006 performance evaluation absent the appellant's protected disclosures. Similarly to what I explained above, the agency in general and TLH in particular had considerable motive to retaliate against the appellant for her protected whistleblowing. The appellant had made significant allegations of wrongdoing against TLH, and if his appointment as a non-citizen violated the federal statute as charged by her, his position was in jeopardy. It is not rocket science to deduce that Henderson would have discussed with TLH the complaints and investigation conducted by the Office of Security, and that TLH knew that Henderson was speaking to the appellant in his April 12, 2006, diatribe. In any event, TLH received a copy of the appellant's July 11 Chertoff letter in late April, and Henderson's April 12 message would have been clear to him.

The agency did not present any evidence that the appellant had received a negative evaluation in her years of service before July 2006; nor did it present any evidence that TLH made similar critical comments in evaluations of other employees who had not made protected whistleblowing disclosures. Also, the evidence allegedly supporting the negative comments TLH made in the appellant's performance evaluation is weak. The negative evaluation comments and TLH's related testimony address the appellant's actions that purport to "fracture teamwork." However, among the four documents TLH put forth to justify his negative comments, two are innocuous emails about the appellant's desk and some food in an office refrigerator, hardly the type of behavior that would justify the negative comments in the appellant's annual performance evaluation. AF2, Tab 39, Appellant's Exhibits II, JJ. Another email allegedly relied on by TLH is dated in May 2006, after the period covered by the

performance evaluation at issue, i.e., May 1, 2005 through April 30, 2006. *Id.*, Appellant's Exhibit LL. One email the appellant sent to a coworker on January 3, 2006, was somewhat harsh in tone, and may have been inappropriate. *Id.*, Appellant's Exhibit KK. However, there is no evidence TLH brought this email to the appellant's attention, discussed it with the other employee, or otherwise investigated the matter.

I find it notable that, prior to the written performance evaluation in July 2006, there is nothing in the record to document that TLH advised the appellant her alleged "teamwork" problems were a significant issue requiring correction or improvement. The written appraisal does not reflect any performance discussions between TLH and the appellant prior to July 2006. *Id.*, Appellant's Exhibit MM; HT, Appellant.  The evaluation form, though, contemplates such discussions during the rating period, and the applicable collective bargaining agreement required TLH to hold at least one discussion with the appellant as close as practical to the "mid-point" of the appraisal period using the agency's Communication Worksheet. AF2, Tab 39, Appellant's Exhibit B. The agency presented no evidence that this was done, and the appellant testified it did not. HT, Appellant.  The agency thus failed to present any credible evidence that, prior to TLH's knowledge of the appellant's protected disclosures, the appellant's performance in general, or lack of teamwork in particular, needed correction or improvement.

In reaching my conclusions about TLH's motivation when making the negative comments in the appellant July 2006 evaluation, I have also considered the hearing testimony and affidavit of Khin Maung Soe, a former employee of the Burmese Service and coworker of the appellant.  HT, Soe; AF2, Tab 39, Appellant's Exhibit TT. Soe resigned from the Burmese Service in May 2007 and now works for Radio Free Asia. He exhibited some anger and bias against TLH and the agency because TLH did not select him for either of the two GS-12 positions also sought by the appellant. In spite of this apparent bias, I find him to

be a credible witness[9] based on his demeanor at the hearing and the detail of his sworn statement and testimony. Soe credibly claimed that TLH had informed him that he (TLH) was aware that the appellant and the union had, among other things complained about his hiring, and that TLH was not pleased with the appellant for doing so.  HT, Soe; AF2, Tab 39, Appellant's Exhibit TT.  This provides additional credence to the appellant's assertions that the performance evaluation TLH gave her was motivated by her protected disclosures.

For all of these reasons, I find the agency failed to present clear and convincing evidence that TLH would have made the derogatory comments in the appellant's July 2006 performance evaluation in the absence of her protected disclosures.

### TLH's selection of Thein Htike Oo to fill the first GS-12 vacancy

As explained in the background discussion above, on April 7, 2006, the agency published a vacancy announcement to fill the position of GS-12 International Broadcaster (Burmese), in the Burmese Service.  TLH was the selecting official, the appellant applied, and TLH did not select the appellant for either of two vacancies filled under the announcement. TLH did not conduct any interviews for the first selection, although he established a rating panel that rated the citizen candidates.  TLH then selected Thein Htike Oo to fill the first GS-12 vacancy on May 30, 2006.  The Board's responsibility is not to determine the "best" candidate for the GS-12 position, or even whether the administrative judge believes the appellant was better qualified than Oo.  Rather, the Board must determine whether the agency has met its burden of proving by clear and convincing evidence, i.e., establishing a firm belief by the administrative judge, that TLH would not have selected the appellant in the absence of her protected whistleblowing.

_____

[9] I note that Henderson testified that Soe is a truthful person. HT, Henderson.

I have already described the strong motives for TLH and Henderson to retaliate against the appellant for her protected whistleblowing. The same motives would apply with equal or greater force to TLH's decision to select Oo and not the appellant for the GS-12 position. With this backdrop, I find the agency has failed to meet its burden of proof. There is no doubt that the appellant was well-qualified for the position. She has a bachelor's degree in English, a bachelor's degree in broadcast journalism from a major U.S. university, and she had extensive experience with the VOA since 2000 doing the type of work required by the position. AF2, Tab 39, Appellant's Exhibits O, P, DD. Also, there is no record of any negative performance issues prior to TLH's negative comments in the appellant's July 2006 performance evaluation, and the evidence reflects the agency gave her performance awards for the prior three years.

TLH testified that Oo was "rated number 1" of all of the candidates, and he wrote the same in the memorandum he wrote to justify Oo's selection. HT, TLH; AF2, Tab 39, Appellant's Exhibit FFF. Understanding the subjectivity involved in such ratings and that two of the three raters gave Oo and the appellant equivalent ratings, LTH's claim may be technically correct and convenient, but it is substantively a stretch. The rating panel, organized by TLH, rated the appellant and Oo essentially equal, with two panelists rating them numerically the same and one panelist rating Oo higher. AF2, Tab 39, Appellant's Exhibit EE. TLH also testified that Oo had "far more" experience than the appellant, but a comparison of their qualifications does not support this superlative language. Especially in light of the appellant's extensive relevant experience in the Burmese Service at the agency, something lacking in Oo's background, the fact that Oo had simply worked more years does not necessarily make him better qualified for the position given the quality of the appellant's experience.

Without the whistleblowing taint, TLH may have selected Oo, or even Soe, rather than the appellant. Absent improper motives, selecting officials have the

discretion to make judgment calls regarding the relative qualifications of "qualified" candidates. The Board generally does not second-guess such judgments. After considering all of the hearing testimony and the documentary record, however, I find the agency has failed to identify anything in Oo's qualifications, or deficiencies in the appellant's, that leaves me with a firm belief TLH would not have selected the appellant, a highly qualified internal candidate, in the absence of her protected whistleblowing disclosures. I therefore find the agency has failed to meet its burden to establish by clear and convincing evidence it would not have selected the appellant for the GS-12 International Broadcaster position absent her protected activity.

TLH's selection of Khin Soe Win for the second GS-12 position

In late May 2006, TLH decided to create an interview panel and conduct interviews to fill the second vacancy because the selection was a "very close call." AF2, Tab 39, Appellant's Exhibit V. On June 6, 2006, LTH and two other employees interviewed the appellant and other qualified applicants for the second GS-12 vacancy. After several exchanges of information and draft memoranda between LTH, the agency's human resources office and management officials to justify selecting a non-citizen, TLH selected Khin Soe Win to fill the vacancy. Virtually all of the issues discussed above regarding Oo's selection apply here.

However, the agency documentation of Win's selection and the testimony of interviewers Hla Hla Than and Jing Zhang provide credible, relevant evidence supporting LTH's decision. HT, Than, Zhang; AF2, Tab 39, Appellant's Exhibits O-Q, S-BB, WW, XX. Than and Zhang both credibly testified regarding the legitimate reasons for rating Win highly, and the interview questions and answers provide persuasive evidence that the selection of Win, whether she was the best candidate or not, was not motivated by the appellant's whistleblowing disclosures. *Id.* I thus find the agency has proven by clear and convincing evidence that TLH would not have selected the appellant for the second GS-12 vacancy even in the absence of the appellant's protected activity.

## DECISION

The appellant's request for corrective action is GRANTED.

## ORDER

I **ORDER** the agency to promote the appellant to the position of GS-12 International Broadcaster (Burmese), in the Burmese Service effective June 12, 2006. I further **ORDER** the agency to remove any negative information from the appellant's July 19, 2006, performance evaluation, specifically the page containing the paragraph "Area for Improvement," and any references to it including the page containing the "Rated Employee's Comments."

I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the appropriate amount of back pay, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 60 calendar days after the date this initial decision becomes final. I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount of back pay and benefits due and to provide all necessary information requested by the agency to help it comply. If there is a dispute about the amount of back pay due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial decision becomes final. Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** the agency to inform appellant in writing of all actions taken to comply with the Board's Order and the date on which it believes it has fully complied. If not notified, appellant must ask the agency about its efforts to comply before filing a petition for enforcement with this office.

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation

necessary to process payments and adjustments resulting from a Board decision are attached. I **ORDER** the agency to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above. The checklists are also available on the Board's webpage at http://www.mspb.gov/mspbdecisionspage.html.

## INTERIM RELIEF

If a petition for review is filed by either party, I **ORDER** the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2)(A). The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final. As part of interim relief, I **ORDER** the agency to effect the appellant's appointment to the position of International Broadcaster, GS-1001-12. The appellant shall receive the pay and benefits of this position while any petition for review is pending, even if the agency determines that the appellant's return to or presence in the workplace would be unduly disruptive.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B). If the appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance. If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that

basis.

FOR THE BOARD:      *Thomas P. Cook*

                        Thomas P. Cook
                        Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **February 11, 2008**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by

electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

> The United States Court of Appeals
> for the Federal Circuit
> 717 Madison Place, NW.
> Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

## ATTORNEY FEES

If no petition for review is filed, you may ask for the payment of attorney fees (plus costs, expert witness fees, and litigation expenses, where applicable) by filing a motion with this office as soon as possible, but no later than 60 calendar days after the date this initial decision becomes final. Any such motion must be prepared in accordance with the provisions of 5 C.F.R. Part 1201, Subpart H, and applicable case law.

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance. Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

30

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE TO THE PARTIES

If this decision becomes the final decision of the Board, a copy of the decision will then be referred to the Special Counsel "to investigate and take appropriate action under [5 U.S.C.] section 1215," based on the determination that "there is reason to believe that a current employee may have committed a prohibited personnel practice" under 5 U.S.C. § 2302(b)(8).

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

### Appellant

U.S. Mail

Moe Moe Htun
26 4th Street
Laurel, MD 20707

### Appellant Representative

U.S. Mail

R. Douglas Taylor, Jr.
5811 Devonshire Dr.
Bethesda, MD 20816

### Agency Representative

U.S. Mail

April Bennett Cabral
Broadcasting Board of Governors
International Broadcasting Bureau
330 Independence Avenue, S.W.
Washington, DC 20237

_____
January 7, 2008
(Date)

_____
Latisha Clinton
Legal Assistant



## DFAS CHECKLIST

## INFORMATION REQUIRED BY DFAS IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES OR AS ORDERED BY THE MERIT SYSTEMS PROTECTION BOARD

AS CHECKLIST: INFORMATION REQUIRED BY IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES

## CIVILIAN PERSONNEL OFFICE MUST NOTIFY CIVILIAN PAYROLL OFFICE VIA COMMAND LETTER WITH THE FOLLOWING:

1. Statement if Unemployment Benefits are to be deducted, with dollar amount, address and POC to send.

2. Statement that employee was counseled concerning Health Benefits and TSP and the election forms if necessary.

3. Statement concerning entitlement to overtime, night differential, shift premium, Sunday Premium, etc, with number of hours and dates for each entitlement.

4. If Back Pay Settlement was prior to conversion to DCPS (Defense Civilian Pay System), a statement certifying any lump sum payment with number of hours and amount paid and/or any severance pay that was paid with dollar amount.

5. Statement if interest is payable with beginning date of accrual.

6. Corrected Time and Attendance if applicable.

## ATTACHMENTS TO THE LETTER SHOULD BE AS FOLLOWS:

1. Copy of Settlement Agreement and/or the MSPB Order.

2. Corrected or cancelled SF 50's.

3. Election forms for Health Benefits and/or TSP if applicable.

4. Statement certified to be accurate by the employee which includes:

    a. Outside earnings with copies of W2's or statement from employer.
    b. Statement that employee was ready, willing and able to work during the period.
    c. Statement of erroneous payments employee received such as; lump sum leave, severance pay, VERA/VSIP, retirement annuity payments (if applicable) and if employee withdrew Retirement Funds.

5. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.